59

MIED (Rev. 03/11) Prisoner Civil Rights Complaint

## Official Use Only

| Case Number | Judge | Magistrate Judge |
|---|---|---|
| | | |

Case:2:15-cv-14465
Judge: Leitman, Matthew F.
MJ: Whalen, R. Steven
Filed: 12-24-2015 At 10:00 AM
PRIS BENNETT V MDOC (AT)



F I L E D
DEC 2 4 2015
CLERK'S OFFICE
U.S. DISTRICT COURT

## PRISONER CIVIL RIGHTS COMPLAINT

*This form is for use by state prisoners filing under 42 U.S.C. § 1983 and federal prisoners filing pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).*

### Plaintiff's Information

| Name | Prisoner No. |
|---|---|
| CARL Bennett | 298713 |

**Place of Confinement** MPF Pugsley Correctional Facility

| Street | City | State | Zip Code |
|---|---|---|---|
| 7401 E Walton rd | Kingsley | MI | 49649 |

**Are there additional plaintiffs?** ☒ Yes  ☐ No

If yes, *any additional plaintiffs to this action should be listed on a separate 8½" x 11" sheet of paper and securely attached to the back of this complaint.* **You must provide names, prisoner numbers and addresses for all plaintiffs.**

### Defendant's Information

| Name | Position |
|---|---|
| Jackson Allegiance Hospital | Dr. Mochoa & staff |

| Street/P.O. Box | City | State | Zip Code |
|---|---|---|---|
| 205 N. E. Ave. | Jackson | MI | 49201 |

**Are you suing this defendant in his/her:** ☐ Personal Capacity  ☐ Official Capacity  ☒ Both Capacities

**Are you suing more than one defendant?** ☒ Yes  ☐ No  All staff Involved in surgrey

If yes, *any additional defendants to this action should be listed on a separate 8½" x 11" sheet of paper and securely attached to the back of this complaint.* **You must provide their names, positions, current addresses and the capacity (personal, official or both) in which you are suing them.**

1

MIED (Rev. 03/11) Prisoner Civil Rights Complaint

## I. PREVIOUS LAWSUITS

Have you filed any other lawsuits in state or federal court relating to your imprisonment?

☑ Yes          ☐ No

If "Yes," complete the following section. If "No," proceed to Part II.

*In (1999, 2000, ~ 2004)*

Please list all prior civil actions or appeals that you have filed in federal court while you have been incarcerated.

| | |
|---|---|
| **Docket or Case Number:** | *Not Sure* |
| **Name of Court:** | *U.S. District Court of Eastern Division District Court of Detroit MI* |
| **Parties (Caption or Name of Case):** | *Against A Police Officer (Blew out my Ear Drum) Excessive Force* |
| **Disposition:** | *No Attorney Denied I Think not sure* |

| | |
|---|---|
| **Docket or Case Number:** | |
| **Name of Court:** | |
| **Parties (Caption or Name of Case):** | |
| **Disposition:** | |

| | |
|---|---|
| **Docket or Case Number:** | |
| **Name of Court:** | |
| **Parties (Caption or Name of Case):** | |
| **Disposition:** | |

***Any additional civil actions should be listed on a separate sheet of 8½" x11" paper and securely attached to the back of this complaint.***

MIED (Rev. 03/11) Prisoner Civil Rights Complaint

## II.  STATEMENT OF FACTS

State here, as briefly as possible, the facts of your case. Describe how each defendant is involved. Include the names of other people, dates and places involved in the incident. Do not give any legal arguments or cite any cases or statutes.

See Attach't notice of Intent a Statement Facts a
medical Records a History

There is more information in medical Records
Cannot Afford Them Jackson Allegiance Hospital a
R6aC Charles Egeler Reception Center

## III.  STATEMENT OF CLAIMS

State what rights under the Constitution, laws, or treaties of the United States have been violated, and be specific.  Set forth each claim in a separate paragraph.  If you intend to allege several related claims, number and set forth each claim on a separate 8½" x 11" sheet of paper and securely attach the papers to the back of this complaint.

First Amendment - Unlawful Restriction of Speech, Religion

Fifth Amendment - Due Process Violations

Sixth Amendment - Interference with the Right to Legal
Cousel

Eighth Amendment - Cruel And Unusal Punishment

Fourteeth Amendment - Due process And Equal Protection
Voilations.       See Attach't. medical Rules a Law,
medical Release Forms a Records Form Lansing mi
need Jackson Allegiance Hospital Records a R6aC (Both Parties)
Charles E Egeler Reception Center Records m.D.O.C.

## IV.  RELIEF

State briefly and exactly what you want the Court to do for you.

Jackson Allegiance Hospital (Puntiue Damages
$ a,000,000.00 ) All medical Paid For Rest of

MIED (Rev. 03/11) Prisoner Civil Rights Complaint

Paid For the Rest of my LIFE AND M.D.O.C.
Cannot touch no monies Received From Civil Actions

I also need all medical Records ordered
By Federal Judge in this Case, Records ordered
From The Following Dates Dec. 11 2013 to Dec 21 2015
and need medical Attorney to Represent me
in this Civil Actions

**I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.**

Executed (signed) on _12/18/2015_ (date).

_Carl Bennett 298713_
Signature of Plaintiff
IN-PRO-PER.

4

# MICHIGAN DEPARTMENT OF CORRECTIONS
## BUREAU OF HEALTH CARE SERVICES
### INTRASYSTEM TRANSFER SUMMARY-TRANSFERRING FACILITY

| | |
|---|---|
| **NAME:** | **Bennett, Carl S.** |
| **ID #:** | **298713** |
| **DOB:** | **12/21/1963** |
| **SITE:** | **DWH** |
| **COMPLETED BY:** | **Penelope J. Vickers  08/04/2014 12:39 PM** |

**Transfer information**

| | |
|---|---|
| Transferring facility: | DWH |
| Receiving facility: | JCS |
| Date of transfer: | 08/04/2014 |

**Current chronic problems**
Hypertension, essential NOS
Infarction, myocardial, old
Disease, ischemic heart, chrn NEC
Asthma

**Current active medications**

| Name Date | Dose | Instructions | Stop |
|---|---|---|---|
| Acetaminophen | 325 Mg 08/09/2014 | 1-3 Tabs PO QID PRN   **Discharge Medication | |
| Albuterol Sulfate **Discharge Medication | 90 Mcg 08/09/2014 | 1 PUFF  Q 4-6 hours PRN. Kite for Refill, limit of 2 canisters/6 month | |
| Aspirin | 325 Mg 08/09/2014 | 1 tab po qd  **Discharge Medication | |
| Carvedilol | 3.125 Mg 08/09/2014 | take one by mouth two times per day  **Discharge Medication | |
| Diltiazem Hcl Medication | 30 Mg 08/09/2014 | 1 tab PO Q 8 hrs (Stop on 8/22/14 per Cardiology)  **Discharge | |
| Ferrous Sulfate **Discharge Medication | 325 Mg (65 Mg Iron) 08/09/2014 | | one tid |
| Lisinopril | 2.5 Mg 08/09/2014 | take one po q day  **Discharge Medication | |
| Nitroglycerin Medication | 0.4 Mg 08/09/2014 | 1 subling prn chest pain, may repeat 1 in 5 minutes x 3  **Discharge | |
| Simvastatin | 20 Mg 08/09/2014 | Take 1 by mouth At bedtime  **Discharge Medication | |

**Medications sent**

| Name | Dose | Amount/# pills |
|---|---|---|
| ACETAMINOPHEN | 325 mg | |
| ALBUTEROL SULFATE | 90 mcg | |
| ASPIRIN | 325 mg | |
| CARVEDILOL | 3.125 mg | |
| DILTIAZEM HCL | 30 mg | |
| FERROUS SULFATE | 325 mg (65 | |
| LISINOPRIL | 2.5 mg | |
| NITROGLYCERIN | 0.4 mg | |
| SIMVASTATIN | 20 mg | |

**Current TB status**

| Obtained/Placed | | Read | Result |
|---|---|---|---|
| 01/02/2009 | 01/04/2009 | 0.00 mm | |
| 04/30/2003 | 05/02/2003 | 0.00 mm | |
| 10/16/2007 | 10/18/2007 | 0.00 mm | |

NAME:  Bennett, Carl  S
NUMBER:  298713
D.O.B :  12/21/1963

# MICHIGAN DEPARTMENT OF CORRECTIONS
## BUREAU OF HEALTH CARE SERVICES
### INTRASYSTEM TRANSFER SUMMARY-TRANSFERRING FACILITY

| | | |
|---|---|---|
| 12/14/2007 | 12/16/2007 | 0.00 mm |
| 12/11/2013 | 12/13/2013 | 0 mm |

### Current active/open orders

| Status | Ordered | Diagnostic | Date | Timeframe |
|---|---|---|---|---|
| ordered | 04/17/2014 | Schedule chronic care clinic Cardiac | 04/17/2014 | 1 Mon |

| Status | Ordered | Office Services | Date | Time |
|---|---|---|---|---|
| ordered | 07/31/2014 | Two gram sodium diet | | |
| declined 1 | | Hep B (ped/adol, 3 dose) | | |
| unknown | | Hep B (ped/adol, 3 dose) | | |
| unknown | | Tetanus toxoid | | |
| unknown | | Tetanus toxoid | | |
| unknown | | DT, for intramuscular use | | |
| ordered | 12/12/2013 | Other: At risk of heat-related illness | | |
| ordered | 12/12/2013 | Medical Equipment/Supplies: Gisses | | |
| ordered | 12/11/2013 | Bubble Follow-up : Past MI`s x I, asthma, HTN, meds | 12/12/2013 | |
| ordered | 12/12/2013 | Chronic Care Clinic M Good : HTN,Asthma,CAD. | 06/12/2014 | |
| ordered | 06/13/2014 | Chronic Care Clinic M Poor : HTN, asthma, HLP, CABG w/ stenosis (review all) | 07/11/2014 | |
| ordered | 01/30/2014 | Chronic Care Clinic M Good : 5-11-B.  HTN, Asthma, CAD. | 06/12/2014 | |
| ordered | 07/11/2014 | Chart Review/Update : status of CABG plans. DONT CALLOUT INMATE | 07/15/2014 | |
| ordered | 02/11/2014 | Chronic Care Clinic M Fair : CC > 2. | 05/20/2014 | |
| ordered | 07/08/2014 | Nurse Sick Call : Instruct to remain NPO after MN tonight. DO NOT MOVE | 07/09/2014 | |
| ordered | 08/01/2014 | Vitals : Daily Vitals | | |
| Extend to Weekly Visit | 08/01/2014 | | | |
| ordered | 01/16/2014 | Chronic Care Clinic Poor : CAD X 1. | 02/14/2014 | |
| ordered | 07/02/2014 | Nurse Sick Call : Instruct to sto plavix after today until after procedure. | 07/05/2014 | |
| ordered | 06/06/2014 | Nurse Visit : recheck groin surgal site (M) | 06/11/2014 | |
| ordered | 06/06/2014 | Other Follow-up : 407 FU ,CT surgery.CAD,w CABG mild residual stenosis | 06/20/2014 | |
| ordered | 01/30/2014 | MSP Sick Call : 5-21-B.  New rin, history of CABGx1, 1/2/14. | 01/30/2014 | |
| ordered | 01/30/2014 | Annual Health Screening : 5-2 | 12/21/2014 | |
| ordered | 07/02/2014 | Nurse Sick Call : Instructed to stop taking Lisinopril until after procedure. | 07/13/2014 | |
| ordered | 01/09/2014 | Nurse Procedures : Soap suds enema x 1 | 01/09/2014 | |
| ordered | 01/07/2014 | Wound Care : Telfa to abdominal wounds, change daily x 5 days | 01/07/2014 | |
| ordered | 01/15/2014 | MSP Sick Call : MP hospital discharge post hospital discharge from CABG surgery. | 01/16/2014 | |
| ordered | 06/27/2014 | Chart Review/Update : No call out - d/c plavix 7/6/2014 | 07/04/2014 | |
| ordered | 06/27/2014 | Chart Review/Update : No call out - d/c ACE 7/6/2014 | 07/11/2014 | |
| ordered | 07/11/2014 | Chronic Care Clinic Poor : status of CAD | 08/05/2014 | |
| ordered | 04/17/2014 | Chronic Care Clinic Poor : CArdiac pt with pending labs. | 05/12/2014 | |
| ordered | 05/13/2014 | Chronic Care Clinic M Poor : F/u CAD (CarTh surg 5/16), HTN | 06/02/2014 | |
| obtained | 12/11/2013 | PPD 0.1 mL ID | 12/13/2013 | |

| Status | Date | Referrals/Consults | Date | Timeframe |
|---|---|---|---|---|
| ordered | 02/11/2014 | Referral to Provider Other | 02/11/2014 | |
| ordered | 06/06/2014 | Referral to Provider Follow up | 06/06/2014 | |

### Comments

Discharge diagnosis s/p cabg triple vessel.  Diet Heart Healthy 2000gm sodium.  Activity as tolerated.  Be as active as possible with rest between activities. No lifting >10 pounds until cleared by cardio-thoracic surgeon.  No pushing or puling avoid stairs.  Allergies NKDA.  Follow up with Cardio407 requested. Msp with in 1-2 days. D/C diltiazem 8/22/14

### Mental Health Assessment

NAME:  Bennett, Carl  S
NUMBER:  298713
D.O.B :  12/21/1963

# MICHIGAN DEPARTMENT OF CORRECTIONS
## BUREAU OF HEALTH CARE SERVICES
### INTRASYSTEM TRANSFER SUMMARY-TRANSFERRING FACILITY

**NAME:** Bennett, Carl S.
**ID #:** 298713
**DOB:** 12/21/1963
**SITE:** DWH
**COMPLETED BY:** Lisa Wurmlinger, RN  01/15/2014 12:23 PM

**Transfer information**
Type of transfer:        intrasystem
Transferring facility:   DWH
Receiving facility:      RGC
Date of transfer:        01/15/2014

**Current chronic problems**
Disease, ischemic heart, chrn NEC
Infarction, myocardial, old
Asthma
Hypertension, essential NOS

**Current active medications**

| Name Date | Dose | Instructions | Stop |
|---|---|---|---|
| Acetaminophen | 325 Mg 01/20/2014 | 2 tabs po Q8H prn pain | |
| Albuterol Sulfate | 2.5 Mg/0.5 Ml 01/20/2014 | NMT 1 AMP QID PRN | |
| Amiodarone Hcl | 400 Mg 01/20/2014 | 1 TAB PO QD | |
| √ Aspirin *None left* | 325 Mg 01/20/2014 | 1 TAB PO QD | |
| √ Clopidogrel Bisulfate *2 wks* | 75 Mg 01/20/2014 | 1 tab po qd | |
| Fluticasone/salmeterol | 115 Mcg-21 Mcg/actuation | PUFFS PO BID | 2 |
| | 01/20/2014 | | |
| Lactulose | 10 Gram/15 Ml 01/20/2014 | 30 cc po BID prn constipation | |
| ) Metoprolol* *2 weeks left* | 25 Mg 01/20/2014 | 1/2 TAB (12.5 MGS) PO BID | |
| Nitroglycerin *Refill* MSP | 0.4 Mg 01/20/2014 | sublingual 0.4 mg q5min prn chest pain x 3. If no improvement then call | |
| Sennosides | 8.6 Mg 01/20/2014 | Take 2 by mouth 2 times a day | |
| √ Simvastatin *2 wks left* | 40 Mg 01/20/2014 | take one by mouth at bedtime | |

**Medications sent**

| Name | Dose | Amount/# pills |
|---|---|---|
| ACETAMINOPHEN | 325 mg | |
| ALBUTEROL SULFATE | 2.5 mg/0.5 | |
| √ AMIODARONE HCL | 400 mg | |
| √ ASPIRIN | 325 mg | |
| CLOPIDOGREL BISULFATE | 75 mg | |
| FLUTICASONE/SALMETEROL | 115 mcg-21 | |
| √ LACTULOSE | 10 gram/15 | |
| √ Metoprolol* | 25 mg | |
| NITROGLYCERIN | 0.4 mg | |
| SENNOSIDES | 8.6 mg | |
| √ SIMVASTATIN | 40 mg | |

PAGE # 1 / 2

NAME:  Bennett, Carl  S
NUMBER:  298713
D.O.B :  12/21/1963

# MICHIGAN DEPARTMENT OF CORRECTIONS
## BUREAU OF HEALTH CARE SERVICES
### INTRASYSTEM TRANSFER SUMMARY-TRANSFERRING FACILITY

**Current TB status**

| Obtained/Placed | | Read Result |
|---|---|---|
| 01/02/2009 | 01/04/2009 | 0.00 mm |
| 04/30/2003 | 05/02/2003 | 0.00 mm |
| 10/16/2007 | 10/18/2007 | 0.00 mm |
| 12/14/2007 | 12/16/2007 | 0.00 mm |
| 12/11/2013 | 12/13/2013 | 0 mm |

**Current active/open orders**

| Status | Ordered | Office Services | Date | Timeframe |
|---|---|---|---|---|
| declined 1 | | Hep B (ped/adol, 3 dose) | | |
| unknown | | Hep B (ped/adol, 3 dose) | | |
| unknown | | Tetanus toxoid | | |
| unknown | | Tetanus toxoid | | |
| unknown | | DT, for intramuscular use | | |
| ordered wrong | 12/12/2013 | Other: At risk of heat-related illness | | |
| ordered wrong | 12/12/2013 | Medical Equipment/Supplies: Glasses | | |
| ordered wrong | 12/11/2013 | Bubble Follow-up : Past MI's x 6, asthma, HTN, meds | 12/12/2013 | |
| ordered wrong | 12/12/2013 | Chronic Care Clinic M Good : HTN,Asthma,CAD. | 06/12/2014 | |
| ordered | 01/09/2014 | Nurse Procedures : Soap suds enema x 1 | 01/09/2014 | |
| ordered | 01/07/2014 | Wound Care : Telfa to abdominal wounds, change daily x 5 days | 01/07/2014 | |
| obtained | 12/11/2013 | PPD 0.1 mL ID | 12/13/2013 | |

**Comments**

Discharge to RGC. Admission Diagnosis: CAD, S/P CABG, Asthma. Discharge DX: Same. Discharge condition: Stable. Discharge Activity: As tolerated. Discharge Diet: Regular, Medications: Nextgen. Please discontinue all IV lines. Follow up with Medical Provider at facility in 5 days. Lifting restrictions of 25#. 407 approved for patient to see cardiologist Dr. Macha around 1/24/2014.

**Mental Health Assessment**



NAME: Bennett, Carl S
NUMBER: 298713
D.O.B : 12/21/[illegible]

**FOCUS™** Terms
Advanced...

Search Within Original Results (1 - 1)    ▼     View
Tutorial

*24 M.L.P. 2d PHYSICIANS & HEALTH CARE PROFESSIONALS § 64*

Michigan Law & Practice

Copyright 2015, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

PHYSICIANS & HEALTH CARE PROFESSIONALS
Chapter 5 NEGLIGENCE AND MALPRACTICE

24 M.L.P. 2d PHYSICIANS & HEALTH CARE PROFESSIONALS § 64

### § 64. Practice and Procedure in Malpractice Actions

**Specific statutory procedures are required in malpractice actions that are not required in other negligence cases.**

A civil action for malpractice may be maintained against any person professing or holding himself out to be a member of a state licensed profession. [832] The common law rules applicable to actions against licensed health care professionals are also applicable against any unlicensed person holding himself out to be a licensed health care professional. [833] Malpractice may also be used as a defense to any action for services rendered by a licensed health care professional or a person holding himself out to be a licensed health care professional. [834]

Medical malpractice actions are based on negligence, but have special procedural requirements that must be followed. Malpractice actions are also subject to different statute of limitations provisions from other negligence actions. [835]

Various matters relating to persons entitled to bring a particular cause of action have been adjudicated. [836]

Return to Text

**FOOTNOTES:**
⊤Footnote 832. MCLS § 600.2912(1).

   **Prior, similar provisions construed and applied**

   Leslie v. Mollica, 236 Mich. 610, 211 N.W. 267 (1926) .

   Norris v. Grove, 100 Mich. 256, 58 N.W. 1006 (1894) .

⊤Footnote 833. MCLS § 600.2912(1).

⊤Footnote 834. MCLS § 600.2912(2).

⊤Footnote 835. *See, infra*, §§ 66-69.

Dunbar v. Adams, 283 Mich. 48, 276 N.W. 895 (1938) .

Brebner v. Sidney Hill Health System, Inc., 269 Mich. 541, 257 N.W. 745 (1934) .

**Choice of law**

Smith v. Pierpont, 123 Mich. App. 33, 333 N.W.2d 165 (1983) .

### "Malpractice" and "negligence" actions distinguished

The supervision and monitoring of psychiatric patients in a psychiatric ward involves questions of professional medical management and, therefore, cannot be judged by the common knowledge and experience of a jury; thus, such a claim is construed as one of medical malpractice, requiring notice of intent to sue and an affidavit of merit.-- Dorris v. Detroit Osteopathic Hosp. Corp., 460 Mich. 26, 594 N.W.2d 455 (1999) .

Footnote 836. *See, also, supra*, § 52, physician and patient relationship.

### Child's grandparents

Child's grandparents, who were also its adoptive parents, could not bring cause of action for failure to diagnose pregnancy.-- Rinard v. Biczak, 177 Mich. App. 287, 441 N.W.2d 441 (1989) (overruled in part by Taylor v. Kurapati, 236 Mich. App. 315, 600 N.W.2d 670 (1999)) .

### Survival of decedent's action

The plain language of the statute states that all actions and claims for medical malpractice survive death; the statute does not state that all pending actions and claims survive death, and to read the term "pending" into the statute would amount to judicial construction where none is warranted; a decedent's personal representative has the right to file any malpractice action that the decedent may have had; a personal representative stands in the shoes of the decedent and only may collect damages that could have been recovered by the decedent had he lived and filed the suit on his own behalf (MCLS § 600.2921).-- Theisen v. Knake, 236 Mich. App. 249, 599 N.W.2d 777 (1999) .



**LexisNexis**   About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us
Copyright © 2015 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

RELX Group™

# LEGAL BULLETIN 8.1
## Medical Rights

Set 8: Medical Care
Bulletin 8.1
Updated May, 2001

Lewisburg Prison Project, Inc.
P.O. Box 128
Lewisburg, PA 17837
(570) 523-1104
www.eg.bucknell.edu/~mligare/LPP.html

This bulletin introduces the medical rights of prisoners and the legal remedies available when those rights have been violated. While this bulletin provides general information and guidance on finding law that may be useful, you'll need to research the law that applies to your case. (At the time of last revision, the cases below were current for the propositions cited, but since the law is always changing, be sure to check cases before relying on them.) We recommend you consult related bulletins (for example, 8.2: Disabled/Psychological Rights (currently being updated), 8.3: AIDS in Prison, and Litigation Bulletins (Set 1)). You may also wish to contact the Southern Center for Human Rights, 83 Poplar Street, N.W., Atlanta, Georgia 30303-2122, an organization that has prisoner self-help books available for inmates. The American Civil Liberties Union (ACLU) National Prison Project publishes a quarterly journal with excellent analysis of legislation and litigation affecting prisoners, and is available to prisoners at an annual cost of $2. You can write the National Prison Project at 915 15th St., NW, 7th Floor, Washington, DC 20005, or call them at (202) 393-4930.

## I. Overview

All inmates are entitled to adequate medical care. The Eighth Amendment to the U.S. Constitution states that "Excessive bail shall not be required, nor excessive fines required, *nor cruel and unusual punishments inflicted."* (emphasis added) The prohibition against cruel and unusual punishment is understood to guarantee a prisoner's right to necessary medical treatment. Pre-trial or pre-sentence inmates have Eighth Amendment protection through the Fourteenth Amendment due process clause. *Bell v. Wolfish,* 441 U.S. 520 (1979). You should be aware that despite the constitutional guarantees of medical care, the fact is that enforcing these rights requires major commitment and persistence. This bulletin should give you some basic tools with which to get started. While we focus here mainly on federal remedies, we strongly encourage you to thoroughly investigate all legal possibilities, which typically will include state tort claims like negligence and malpractice.

## II. Obtaining Medical Care in Prison/Jail
### A. What type of care is available, and how do I get it?

Generally speaking, you should have access to all necessary medical treatment, including emergency, mental health, dental, and eye care. Courts have held that an adequate medical system will conduct an initial health screening of inmates, and have a reasonable sick call

1

procedure. *Casey v. Lewis,* 834 F.Supp. 1477 (D. Ariz. 1993) (constitutional violation where long line at sick-call discouraged use); *Inmates of Occoquan v. Barry,* 717 F.Supp. 854 (D. D.C. 1989) (lack of adequate initial screening contributed to constitutional violation).  Normally you will first see a nurse or physician's assistant (PA), who may then refer you to a doctor, dentist, psychologist, etc.  You should be patient, persistent, and clear in explaining to this person what your symptoms are and why you need to see a doctor.  When an institution can't itself provide the necessary treatment, it will need to provide access to outside treatment.  For example, the 5th Circuit found an Eighth Amendment violation where an inmate requiring oxygen for his emphysema was not transferred to an equipped facility.  *Payne v. Lynaugh,* 843 F.2d 177 (5th Cir. 1988).

   If you can't get what you need (for example, a referral or medication), you'll need to present a grievance as soon as possible, to preserve evidence of the seriousness of your need. And if your grievance isn't effective, you'll need to go to the next level of the process within the system.  In this and all cases, *keep documentation of your contacts with medical and facility personnel.*

## B. Can I be charged for medical care?

   You can be; *however,* you can't be denied treatment you need because you can't afford it. About half the states have inmate co-payment systems, and in many cases, the co-payment is withdrawn from the inmate's account.  Some services, like an intake health screen or emergency care, are free, probably because the stated goal of such programs is to discourage abuse of the medical system.  New Jersey's system is typical: co-payments are required for some services unless an inmate is unable to pay.  *Mourning v. Correctional Medical Services,* 692 A.2d 529 (N.J. Super. 1997).  The state supreme court found this practice constitutional, relying on *Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239 (1983).  In *Revere,* the U.S. Supreme Court held that prisons and jails need only ensure that care is provided, and that the cost of care is a state law matter.  Thus, for example, the 3rd Circuit approved as constitutional a system requiring a small fee for certain treatments in *Reynolds v. Wagner,* 128 F.3d 166 (3d Cir. 1997), but the 10th Circuit found that a Colorado law that didn't make exceptions for chronically ill inmates could violate the Eighth Amendment by denying poor inmates care.  *Collins v. Romer,* 962 F.2d 1508 (10th Cir 1992).

## C. Do I have access to my medical records?

   In the federal system, prisoners have the right to medical, but not psychiatric, records. The *Benavides* case established that the Justice Department could require federal inmates to seek records through a physician he or she was allowed to designate, and could impose other special procedures concerning obtaining medical records, as long as it "guarantee[d] the ultimate disclosure" of the records to the prisoner requesting them.  *Benavides v. U.S. Bureau of Prisons,* 995 F.2d 269, 273 (D.C. Cir. 1993).  In state institutions, policies vary, and you may be required to pay for records.  For your protection, you should create your own medical record, keeping a detailed account of all medical incidents, including dates, names, symptoms, medications, side effects, etc.

   Your medical information is private, which means that it can't be disclosed to non-

2

medical staff, and some courts have objected to using inmates as record clerks for this reason. See, for example, *Woods v. White*, 689 F.Supp. 874 (W.D. Wis. 1988), *affirmed*, 899 F.2d 17 (7th Cir. 1990). This privacy right applies to the information in your records, as well. For example, in a recent case, an officer revealed in the presence of staff and other inmates that an inmate had undergone a sex change operation and was HIV-positive, with the result that the inmate was harassed by guards and prisoners. The court held that the inmate had a constitutional right to privacy in her medical status if there was no valid safety issue requiring release of the information, and that the guard and supervisor were deliberately indifferent to her safety. *Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999). Some courts have recognized exceptions, though, and the court in *Powell* noted that this privacy interest will vary with the condition. One court has distinguished between "deeply personal" and "mundane" information, with only the former being protected. *Khalfani v. Secretary, Dep't of Veterans Affairs*, 1999 WL 138247, *6 (E.D. N.Y. 1999) (memorandum and order). Another has made the following exception to the medical privacy right: disclosure of medical information at sentencing is in the interest of the inmate in order to send the inmate to the appropriate facility. *Faison v. Parker*, 823 F.Supp. 1198 (E.D. Pa. 1993).

### D. If you're having trouble with medical treatment, be sure to:

1. <u>Keep all records</u>. This can't be over-emphasized. Document your involvement with medical staff, your symptoms, the circumstances of any injuries, your attempts to get treatment, any diagnoses made — in short, document and keep records of everything. Note whom you dealt with, when, what was said and done, etc. This documentation will be critical if you decide to file a legal claim. Send copies to someone on the outside for safekeeping, keeping copies for yourself.

2. <u>File administrative remedies</u>. This means, pursue the grievance process available in your institution. Doing this is crucial because the Prison Litigation Reform Act, discussed below, requires that civil rights plaintiffs exhaust all administrative remedies before they file a lawsuit. If all available remedies are not exhausted, the court will dismiss a complaint at the outset. You may also consult our legal bulletin on exhaustion of administrative remedies (1.4) that will soon be available.

## III. The Basics of Taking Legal Action

First, you should understand that legal action can take many months or even years to resolve. This is another reason to pursue administrative remedies: you may be able to resolve your situation within the system. If you decide to sue, there are three main sources of law that can provide a means to get your case to court — statutory, common, and constitutional law.

Statutes are laws passed by a legislature and are found in a state's published collection of "revised statutes" or in its "code." Federal statutes are found in the United States Code. For purposes of this discussion, state statutes and cases (the law from court cases is sometimes called common law) address tort law (civil suits for damages), and federal statutes establish procedure governing civil rights law. When you're having trouble with medical treatment, you will want to look at state tort law, discussed further below, and the Federal Tort Claims Act (FTCA), if you're a federal prisoner. If you file your case as an FTCA suit, you'll need to look at state tort law too,

as it will determine the grounds for your suit despite the fact that you'll file in federal court. Obviously, part of the complexity of a prisoner's lawsuit is untangling the relationship between these various laws.

The constitutions of your state and the federal government represent another body of law that can get your case heard in court. Some states have constitutional protections that exceed those found in the federal constitution. If you are a state prisoner with a federal constitutional claim (the focus of this bulletin), you will need to bring the suit using the federal statutory procedure found in 42 U.S.C. § 1983 (called a "section 1983" suit). If you're a federal prisoner with an Eighth Amendment claim, you'll bring what's called a "Bivens" action. Because there isn't a statute corresponding to § 1983 that authorizes suits to vindicate federal prisoners' rights, the U.S. Supreme Court authorized the right in the *Bivens* case. *Bivens v. Six Unknown Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Federal jurisdiction is established for *Bivens* claims in 28 U.S.C. § 1331. (If you're a federal prisoner, you should watch for a U.S. Supreme court decision that may come out by summer 2001, deciding whether a private prison can be sued under *Bivens*. The lower court decision being reviewed is *Malesko v. Correctional Services Corp.*, 229 F.3d 374 (2d Cir. 2000), which held that private prisons can be sued.)

Title II of the Americans With Disabilities Act (ADA) is another mechanism for bringing suit when an inmate has a disability and believes he or she is getting inadequate care based on discrimination because of that disability. "Disability" has been broadly defined under the ADA to include HIV/AIDS status and mental illness. The ADA is found beginning at 42 U.S.C. § 12131; see *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998) for a recent case applying the ADA to the prison context. (Note that on remand, in *Yeskey v. Pennsylvania*, 76 F.Supp.2d 572 (M.D. Pa. 1999), the district court found that *individual* defendants could not be sued under the ADA, and that in any event the plaintiff had failed to show a disability.) The Rehabilitation Act (RA) is another federal statute that prohibits discrimination based on disability in federal and other agencies receiving federal funds. See 29 U.S.C. § 794 and subsequent sections.

If you decide to file a lawsuit, you'll start by writing to the Clerk of the U.S. District Court of the district you're in (most states have several districts), and requesting forms for the action you want to file. Your lawsuit officially begins with your "complaint" to the court, in which you allege the facts of your case (facts are "alleged" until proven) and that your constitutional right to adequate medical treatment has been violated. Of course, you need to be sure you meet the filing deadlines that apply to your claim.

### A. Prison Litigation Reform Act

While the Prison Litigation Reform Act is discussed at length in a separate publication (*A Guide to the Prison Litigation Reform Act*), we'll lay out the basics here, since the statute applies to all federal suits by inmates, and has a number of major implications for your lawsuit that you need to understand before you file.

1. Filing fees: 28 U.S.C. § 1915(f)(2). The filing fee in federal court actions is $150. Prisoners planning to file as indigent (*in forma pauperis*) need to submit certified statements of their prison accounts for the last six months, because the fee will be drawn from these accounts

over time. Inability to pay up front is not cause for your suit to be dismissed. Note though that if you file your case and it is dismissed before you have paid the fee, the amount is still due.

2. "Three Strikes": 28 U.S.C. § 1915(g). Under the PLRA, the district court first reviews prisoners' lawsuits to see if they are frivolous, malicious, or if they fail to state a valid legal claim. If a suit is found to be one of the three, it will be dismissed and count as one "strike." If an individual gets three strikes (has three suits dismissed on one of these grounds), he or she will be unable to file any future suits *in forma pauperis*, "unless the prisoner is in imminent danger of serious physical injury" when the case is filed. In practical terms, this means you should carefully plead (set out) your case to ensure that you state a valid claim that the court can address, and that the defendants you name are not immune from suit. (More below on this).

3. Exhaustion of administrative remedies: 42 U.S.C. § 1997e(d)(2). Exhaustion means raising your issues in the grievance system in your institution, and pursuing them to the fullest extent there. You'll need to raise all the issues you would in a lawsuit, since courts have held that failure to raise particular issues at the administrative level prohibits you from litigating them. As noted above, failure to exhaust before filing can get your case dismissed. Dismissal for failure to exhaust should be without prejudice, enabling you to re-file after you've pursued administrative remedies. Even if the incidents in your case occurred before the PLRA's passage in 1996, if you filed your complaint after that date, this requirement applies.

4. "Prior showing of physical injury": 42 U.S.C. § 1997e(e). This provision (which also applies to the FTCA and ADA) requires that all Eighth Amendment suits must now include a claim of physical harm in order to also sue for emotional harm. The physical harm must be more than minimal but not necessarily substantial. So far, federal courts have held that the physical injury requirement doesn't apply to remedies, like injunctive relief, designed to get a defendant to do or stop doing a particular thing. So far this requirement *does* seem to apply to suits for money damages.

5. Revocation of Earned Time: 28 U.S.C. § 1932. If a court finds that a claim is malicious or filed to harass a party, or that you knowingly present false information, it may revoke your earned time credit. This is obviously another provision designed to discourage prisoners' litigation, and just another reason to plead your case with great care.

6. Diversion of damages: provision appears after 18 U.S.C. § 3626. Compensatory damages are "diverted" from payment to the successful prisoner plaintiff to satisfy restitution owed. Any remainder then goes to the prisoner.

As you can see, the restrictions of the PLRA are critical to understand before you file. These notes are just to give you some sense of what's involved, so look closely at the Act, and review the publication that addresses it. The U.S. Code Annotated (U.S.C.A.) provides cases that illustrate the provisions that make up the PLRA.

*B. Other general litigation issues:*

 1. Immunity: who can you sue?

For purposes of § 1983 (or *Bivens* claims), you'll need to assert that defendants were acting "under color of state law," meaning, under governmental authority. (Included here are agents of a city or county.) Defendants can be either government entities or employees, or private contractors with the government (for example, a doctor under contract to provide services to a prison.) An employee may be acting under authority of the government even if the particular conduct isn't authorized, and of course it's often this bad conduct you'll be suing about.

The potential problem for your lawsuit is that often people acting on behalf of the government are entitled to some immunity, which means an individual or entity is protected from being sued. The general principle is that prison officials usually get "qualified immunity" from suit, meaning they are protected from suit *for damages* — *if* their conduct doesn't violate constitutional rights which they should have known about. *Harlow v. Fitzgerald,* 457 U.S. 800 (1982). Officials acting on reasonable advice from medical personnel will not be liable. See, for example, *Miltier v. Beorn,* below. The kinds of actions on the part of officials that may give rise to liability include failure to provide adequate staff (in terms of number or training), or to maintain policies that make adequate care possible. See *Ramos v. Lamm,* below, for a case in which various policies and practices contributed to system-wide constitutional violations.

The Supreme Court has held that private guards working for a jail or prison may be liable under § 1983 if they were acting "under color of state law" when they committed a constitutional violation. *Richardson v. McKnight,* 521 U.S. 399 (1997). This case also established that private guards do not have immunity from suit. The Court has also held that private physicians under state contract may be liable under § 1983. *West v. Atkins,* 487 U.S. 42 (1988). You can count on defendants claiming they're immune.

Officials may be liable for your injury despite the fact that they weren't directly involved. This is obviously a little more tricky to prove. For example, an official may be liable for "failure to train" prison employees when you can show training would have prevented the constitutional violation, and the official deliberately chose not to institute training. *Erwin v. County of Manitowoc,* 872 F.2d 1292 (7th Cir. 1989). The way it might work is, where a warden and deputy are aware of an inmate's injury and aware of a guard's failure to get the inmate necessary treatment, the officials may be held liable for failure to adequately supervise and train the guard. *Petrichko v. Kurtz,* 52 F.Supp.2d 503 (E.D. Pa. 1999). You can see that what's crucial is not just that a problem of constitutional dimension existed, but that a responsible official knew about it.

 2. Tort suits: negligence and malpractice

Tort suits are the causes of action (grounds for a suit) that may be available in state law (and for federal prisoners via the FTCA). (*Tort* is a French word meaning "wrong") You aren't limited, generally, to bringing *either* constitutional *or* tort claims: "supplemental" jurisdiction makes it possible for federal courts to hear state claims arising from the same basic facts as your federal claim. When you seek supplemental jurisdiction, and in fact whenever you want the court to do a particular thing, in your pleadings you have to specifically ask the court to do it.

Negligence, in general terms, is an act or omission that breaches the "duty of care" that a

6

reasonable person would exercise under the circumstances. Malpractice is basically professional negligence. The "elements" (or components of the claim) that have to be proven to establish negligence will be:

1. That the defendant/s owed you a duty of care, and
2. That the defendant/s breached this duty.
3. That the breach caused the harm you're complaining of, and
4. That you suffered damage as a result.

In the context of medical treatment, the underlying concept is that individuals entrusted to care for medical needs are responsible for exercising reasonable care and meeting established professional standards in doing their work. If you are suing on a theory of medical malpractice, you will need to allege that medical personnel did not have or did not use the skill or professional judgment that is the norm in the medical field in question. In other words, to succeed on your claim you'll need to demonstrate both the applicable standard of care, and that the defendant/s breached it.

Whether you are suing medical personnel or prison officials, you will be required to show "proximate cause" between the harm you've suffered and the act or omission of the defendant/s. This means you have to show that the defendant's act *produced* the harm you suffered, without the intervention of some other actor or event, and that except for the defendant's act or omission, the harm would not have occurred. For example, a prisoner charging a doctor with negligence failed to state a claim where he did not allege that the doctor deviated from accepted medical practice (that he had breached a duty of care) or that any alleged treatment proximately caused his injury. *Parker v. State*, 661 N.Y.S. 2d 868 (App. Div. 3d Dep't 1997). The *Restatement of Torts*, published by the American Law Institute, or a torts "hornbook" (explaining the basics of the law) like that by Prosser and Keaton or the *Nutshell* series, will be useful. Of course ultimately the law that will apply is that of your state.

Institutions should have written regulations specifying standards of care for prisoners. (In addition to the rules that apply to your particular institution, the U.S. Department of Justice has set forth "Federal Standards for Prisons and Jails," and the American Correctional Association, which accredits institutions, also have standards that will be persuasive to cite.) These tort actions will require that you submit evidence of the type of care you should have received, which will typically be the standard of care that applies to your geographic area and/or the field of medicine in question in your case, and evidence of the specific nature of the injury you suffered. Very often tort actions in the medical context require expert testimony, which can be costly.

### 3. Summary Judgment (judgment before or without trial):

Whatever type of suit you file, you'll almost certainly be faced with the defendant's motion for summary judgment, which will allege that there are no disputed facts in the case, and the court should decide against you as a matter of law. Once again, you'll need to plead your case carefully and specifically, highlighting factual disputes. If the court can see that there are questions of fact that are central to your case, you can withstand the summary judgment motion. For instance, the difference between malpractice and deliberate indifference is factual, and so

7

can't be resolved at the summary judgment stage, which would mean your case could go forward. *Kaminsky v. Rosenblum*, 737 F.Supp. 1309 (S.D. N.Y. 1990). For a case offering a thorough discussion of summary judgment, see *Starbeck v. Linn County Jail*, 871 F.Supp. 1129 (N.D. Iowa 1994). In a case that illustrates a number of the issues this bulletin discusses, a prisoner claimed that the medical director of the Bureau of Prisons was deliberately indifferent to her serious medical need by failing to insure she got the treatment she needed. (An Eighth Amendment claim must state an *official's deliberate indifference,* with respect to *a serious medical need:* we cover this standard in detail below.) The medical director asserted qualified immunity, arguing that he had complied with the bureau's policy, which the prisoner admitted was constitutional. The court found both that the defendant wasn't the right person to address the plaintiff's requests, and that while she had asserted she had a medical condition, she hadn't demonstrated a specific need, so the director's response couldn't have violated the Eighth Amendment. The court granted the defendant summary judgment. *Farmer v. Moritsugu,* 163 F.3d 610 (D.C. Cir. 1998).

    <u>4. Class Actions</u>

    Class actions are not discussed here, since a decision to undertake a class action requires an attorney. (The rationale here is that a prisoner suing *pro se* is not a lawyer who can represent the legal interests of class members.) Prisoners' rights organizations may take on class actions, which can be powerful ways of changing widespread problems in a facility. *Ramos v. Lamm,* 639 F.2d 559 (10th Cir. 1980) provides an overview of a successful suit alleging various constitutional problems with a correctional system as a whole, including medical treatment.

## IV. The Eighth Amendment's Cruel and Unusual Punishment Standard as Applied to Medical Care

    *Estelle v. Gamble* is the fundamental Eighth Amendment medical treatment case, establishing that "deliberate indifference to the serious <u>medical needs of prisoners</u>" violates the Eighth Amendment and creates liability under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976). The Court there set out 3 general types of prohibited conduct: "indifference . . . manifested by prison doctors in their response to the prisoner's needs[,] or by prison guards . . . intentionally denying or delaying access to medical care[,] or intentionally interfering with the treatment once prescribed." *Id.* As the language of the case makes plain, the first component of a successful claim will require establishing <u>deliberate indifference</u>. A prisoner will then have to establish that his or her <u>medical need was serious</u>. Obviously, neither of these requirements is self-explanatory, and courts have provided some clarification in the cases below.

### A. Deliberate Indifference

    Clearly, not all harmful acts or omissions result from *deliberate* indifference. Acts, even if they inflict pain, that result from mistake or neglect may create liability for negligence or malpractice, but will usually not be deliberate indifference. *Wilson v. Seiter,* 501 U.S. 294 (1991). (While this is generally true, the 2nd Circuit has found that some instances of medical malpractice may rise to the deliberate indifference level. *Hathaway v. Coughlin,* 99 F.3d 550 (2d Cir. 1996)). At the same time, you don't have to show malice or purpose to harm to establish deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825 (1994). The U.S. Supreme Court has

8

held that to create liability for Eighth Amendment purposes, "the official [must] know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. Deliberate indifference can be demonstrated by an act or omission that was either a one-time incident or part of an ongoing situation. The analysis will be sensitive to the particular circumstances of each case. Thus, the 7th Circuit recently found that a plaintiff's focus on lapses in treatment in the last few *days* of an inmate's life distorted the evidence, since officials were attentive to his medical needs in his final *weeks*: hence, there was no deliberate indifference. *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587 (7th Cir. 1999). The 5th Circuit has provided a useful overview: one episode of gross misconduct is not necessarily excused by an overall pattern of attentiveness, since the issue is whether the conduct is cruel and unusual because it involves deliberate indifference, rather than an accident or a medical judgment call. *Murrell v. Bennett*, 615 F.2d 306 (5th Cir. 1980).

In most cases, a disagreement about treatment won't constitute deliberate indifference. Courts have said that while inmates are entitled to adequate medical treatment, this doesn't mean they must receive their preferred treatment. At the same time, a doctor may be liable if he or she "consciously chooses 'an easier and less efficacious treatment plan.'" *Chance*, below, at 703, quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974). In addition to cases in which an inmate is denied care, deliberate indifference may be shown where there is interference with treatment or significant delay in providing treatment. The amount of delay that will rise to the level of constitutional violation typically depends on the urgency and magnitude of the need. The 10th Circuit has recently held that delay constitutes deliberate indifference where the plaintiff can show that the delay caused substantial harm; this harm can include unnecessarily prolonged pain and suffering. *Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000).

Beyond these general principles, the cases below should help give you a sense of how courts understand deliberate indifference.

1. Cases generally illustrating the *state of mind requirement* for deliberate indifference:

   * High-level prison officials were not entitled to dismissal of prisoner's complaint where inferences could be drawn from the pleadings that a prison officer threw away inmate's doctor-prescribed orthopedic shoes and canes, that inmate could not get treatment from prison doctor, that standard prison-issue shoes cause him constant pain, and where inmate had written to officials about these problems. *Saunders v. Horn*, 960 F.Supp. 893 (E.D. Pa. 1997). Compare the following case: a pregnant inmate didn't establish sheriff's supervisory liability for allegedly failing to provide her with adequate medical treatment. She didn't offer evidence to rebut sheriff's statements that he had no personal involvement in depriving her of treatment, that the jail's policy was to provide reasonable medical care, and that he had neither received a request for treatment nor knew of any denial of treatment. *Ludlam v. Coffee County*, 993 F.Supp. 1421 (M.D. Ala. 1998).

   * Prison doctors who knew of inmate's hernia, which required surgery, and who nonetheless allowed the inmate to go 2 years without surgery were deliberately indifferent. *Barry v. Ratelle*, 985 F.Supp. 1235 (S.D. Cal. 1997).

⑨

\* Evidence suggested that officials who deprived inmate of glasses and vision treatment knew of the seriousness of his condition. *Koehl v. Dalsheim,* 85 F.3d 86 (2d Cir. 1996).

\* Doctors failed to respond to inmate's complaint of chest pain, blackouts, and breathing problems, and inmate later died of a heart attack. *Miltier v. Beorn,* 896 F.2d 848 (4th Cir. 1990).

\* Although prisoner told guards fumes were entering his cell, he was made to stay in the cell and passed out as a result. *Kelley v. Borg,* 60 F.3d 664 (9th Cir. 1995).

\* Evidence of falsification of medical records showed deliberate action. *Green v. Branson,* 108 F.3d 1296 (10th Cir. 1997).

\* Prison officials, aware that paraplegics in solitary confinement were denied medical care, showed deliberate indifference. *Simmons v. Cook,* 154 F.3d 805 (8th Cir. 1998).

\* Failure to treat an inmate with cancer who is in great pain is deliberate indifference bordering on "barbarous." *Ralston v. McGovern,* 167 F.3d 1160 (7th Cir. 1999).

\* Where evidence showed officials were not aware of inmate's pain due to a dislocated shoulder, there was no deliberate indifference. *Higgins v. Correctional Medical Services of Ill.,* 178 F.3d 508 (7th Cir. 1999).

\* Upon a prison psychologist's recommendation that inmate should be denied access to objects that could be used for violence, he was prevented from using a wheelchair, but since officials didn't have knowledge of this deprivation, there was no deliberate indifference. *Shakka v. Smith,* 71 F.3d 162 (4th Cir. 1995). Compare *Beckford v. Irvin,* 49 F.Supp.2d 170 (W.D. N.Y. 1999), in which prisoner sued under ADA & § 1983 because he was prevented from using his wheelchair for lengthy periods, was unable to shower, developed bedsores, and was prevented from using a cup to take water from the toilet to bathe. The court found punitive damages against supervisory officials were not excessive, since the plaintiff showed that they had knowledge of both his serious needs and the fact that injury would result if he wasn't treated.

\* Caution: the court found a claim frivolous (which would mean a potential PLRA "strike") where guards confiscated the special mattress an inmate used, but inmate didn't allege evidence that his kidney stones required mattress, or that guards knew of his need. *Kayser v. Caspari,* 16 F.3d 280 (8th Cir. 1994).

<u>2. Situations that will generally *not* constitute deliberate indifference:</u>
**a. Negligence/malpractice (not deliberate indifference)**
\* Negligence at most where prisoner with stomach problems was treated monthly and received special diet and medication. *Stroud v. Roth,* 741 F.Supp. 559 (E.D. Pa. 1990).

\* No § 1983 claim and at most negligence where inmate alleged dentist should have taken x-rays before extracting 4 teeth. *Hogan v. Russ,* 890 F.Supp. 146 (N.D. N.Y. 1995).

\* Negligence or mistake rather than Eighth Amendment violation when inmate given wrong dose of medication, and no evidence of deliberate indifference presented. *Callaway v. Smith County*, 991 F.Supp. 801 (E.D. Tex. 1998).

\* But: A prison doctor's *repeated* negligence *can* establish deliberate indifference. *Brooks v. Celeste*, 39 F.3d 125 (6th Cir. 1994).

\* Caution: in a case from 1970, a claim was held frivolous because it alleged at most malpractice rather than facts that would support a § 1983 action. (Recall that a finding of a claim's frivolousness can mean a PLRA "strike.") *Isenberg v. Prasse* 433 F.2d 449 (3d Cir. 1970).

### b. Disagreement about treatment

\* Doctor's exercise of professional judgment is never deliberate indifference. *Gindraw v. Dendler*, 967 F.Supp. 833 (E.D. Pa. 1997).

\* Inmate alleged nurse failed to prescribe adequate pain medication over 21 days; the court found this was merely a difference of opinion about treatment between inmate and prison officials, and granted defendant summary judgment. *Reeves v. Caldwell*, 1999 WL 375580 (D. Or. 1999).

\* Where there is a medical reason for a given treatment, an inmate's disagreement will not state an Eighth Amendment claim. *Perkins v. Kansas Dep't of Corrections*, 165 F.3d 803 (10th Cir. 1999).

\* Summary judgment for defendants, despite prisoner's intense pain, where it was not clear from the pleadings that there was an issue beyond disagreement with treatment. *Cameron v. Sarraf*, 2000 WL 33128615 (E.D. Va.2000).

\* No deliberate indifference where doctor didn't biopsy what he diagnosed as inmate's basal cell carcinoma; matter of professional judgment, and carcinoma is slow-growing and not life-threatening. *Gonzalez v. McGue*, 2001 WL 13341 (S.D.N.Y. 2001).

### c. Misdiagnosis

\* Inmate's claim that prison medical personnel misdiagnosed/mistreated his or her condition is a state malpractice, not a constitutional, matter. *Lewis v. Angelone*, 926 F.Supp. 69 (W.D. Va. 1996).

\* A doctor's misdiagnosis of a tumor which later caused an inmate's blindness was, at most, negligence. *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998).

\* Jail inmate who complained for several months of severe stomach pain was diagnosed

11

with colon cancer after his release, but the jail's misdiagnosis of his condition was negligence, at most. *McElligott v. Foley,* 182 F.3d 1248 (11th Cir. 1999).

   3. Situations more likely to be seen as representing deliberate indifference:

   **a. Inadequate facilities/system as a whole**

   Adequate equipment and facilities are required. Courts have found 8th Amendment violations where institutions have not provided:

- X-ray equipment, *Inmates of Occoquan v. Barry,* 717 F.Supp. 854 (D. D.C. 1989).
- medical supplies or medical room, *Dawson v. Kendrick,* 527 F.Supp. 1252 (S.D. W.Va. 1981).
- lab, lab records, pharmacy records or supervision, *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977).
- adequate transportation, when inmates required transfer for some services, *Ramos v. Lamm,* above.
- sanitary medical unit, or observation when sick inmates left in cells, *Lightfoot v. Walker,* 486 F.Supp. 504 (S.D. Ill. 1980).
- segregation of contagious inmates, *Newman v. Alabama,* 349 F.Supp. 278 (M.D. Ala. 1972).
- proper AIDS treatment, prevention, & counseling, *Franklin v. District of Columbia,* 960 F.Supp. 394 (D. D.C. 1997). The circuit court, however, held that failure of the institution to always provide interpreters in medical exams, or to hire bilingual medical personnel, was not an Eighth Amendment violation in the absence of proof of intention to deny inmates medical access. *Franklin,* 163 F.3d 625 (D.C. Cir. 1998).

   * Prisoner with multiple sclerosis had Eighth Amendment claim that officials failed to provide adequate medical care where he showed he had not seen a doctor since entering the facility 18 months earlier, had received no physical therapy or assistance with daily needs, and was housed in cell with malfunctioning call-button. *Yarbaugh v. Roach,* 736 F.Supp. 318 (D. D.C. 1990).

   * System inadequate where inmate missed 2 hospital appointments because prison officials were late in transporting her. *Women Prisoners v. District of Columbia,* 877 F.Supp. 634 (D. D.C. 1994).

   **b. Inadequate staff (numbers &/or training)**

   * Eighth Amendment violation where untrained staff performed emergency medical treatment. *Madrid v. Gomez,* 889 F.Supp. 1146 (N.D. Cal. 1995).

   * Municipality liable for hiring untrained doctor who caused severe sinus damage to inmate. *Simpkins v. Bellevue Hosp.,* 832 F.Supp. 69 (S.D. N.Y. 1993).

   * Section 1983 cause of action against head of corrections where unlicensed doctor was hired to treat inmates and doctor displayed gross negligence in his amputation of inmate's leg.

12

*Williams v. Ward,* 553 F.Supp. 1024 (W.D. N.Y. 1983).
      * Staff unqualified to identify mental illness violated Eighth Amendment. *Carty v. Farrelly,* 957 F.Supp. 727 (D. V.I. 1997); *Casey v. Lewis,* 834 F.Supp.1477 (D. Ariz. 1993).

      * Eighth Amendment violation where mentally ill inmates were put in lockdown because there weren't staff qualified to make a diagnosis. *Casey v. Lewis,* above.

      * One psychologist, with other prison responsibilities, insufficient for 90 inmates. *Klinger v. Nebraska Dep't of Corrections,* 824 F.Supp. 1374 (D. Neb. 1993).

      * BUT, treatment by physician assistant rather than doctor after assault not deliberate indifference. *Harris v. Roberts,* 719 F.Supp. 879 (N.D. Cal. 1989).

### c. Interference with/interruption of treatment
      * No deliberate indifference (negligence, at most) where psychologist instructed guards to check vital signs every 4-6 hours and guards failed to do so over about 7 hours. *Williams v. Kelso,* 201 F.3d 1060 (8th Cir. 2000).

      * A nurse's interruption of prescribed treatment constituted deliberate indifference, despite the fact that the inmate's wound eventually healed. *Boretti v. Wiscomb,* 930 F.2d 1150 (6th Cir. 1991).

### d. Delay
      * Ten-fifteen minute delay in doctor's response to an inmate's cardiac arrest is deliberate indifference. *Bass by Lewis v. Wallenstein,* 769 F.2d 1173 (7th Cir. 1985).

      * Two-hour delay in treating stab wounds shows deliberate indifference. *Reed v. Dunham,* 893 F.2d 285 (10th Cir. 1990).

      * Deliberate indifference where inmate with symptoms of a heart attack and severe pain suffered delay of several days before being taken to a hospital, where he was found to have in fact suffered a heart attack. *Sealock,* above.

      * *However,* one court granted summary judgment to defendants when inmate with kidney failure, who was prevented from obtaining scheduled dialysis treatment, failed to show the delay's negative effect. *Napier v. Madison County, Kentucky,* 2001 WL 8334 (2001).

      * Inmate temporarily denied treatment for 2 infected toes didn't raise § 1983 claim, since toes presented no substantial potential for harm if not treated, and no serious harm was suffered. *Andrews v. Glenn,* 768 F.Supp. 668 (C.D. Ill. 1991).

### B. Serious Medical Need
      As you can imagine, this determination will be very fact- and case-specific, although there are a few general principles that apply. Serious conditions need not be life-threatening.

*Washington v. Dugger,* 860 F.2d 1018 (11th Cir. 1988). Serious medical need will have been diagnosed by a doctor as requiring treatment, or will be so obvious that even a layperson would see that treatment is needed. *Hunt v. Uphoff,* 199 F.3d 1220 (10th Cir. 1999). A condition may also be serious if it significantly affects an inmate's daily activities. *McGuckin v. Smith,* 974 F.2d 1050 (9th Cir. 1992). Generally then, a condition will be a serious medical need for Eighth Amendment purposes if it causes pain or discomfort. For example, a hernia, while not necessarily fatal, is painful and so it is "serious." *Johnson v. Lockhart,* 941 F.2d 705 (8th Cir. 1991). Conditions that threaten future health may also be serious enough to create liability. In a case where an inmate was denied prescription medication, a court found that he was not required to show more than a 50% risk of developing TB, but only that the risk had increased due to his being denied the medication. *Hill v. Marshall,* 962 F.2d 1209 (6th Cir. 1992). Also see an important U.S. Supreme court case on future risk, *Helling v. McKinney,* 509 U.S. 25 (1993).

Finally, there are serious conditions for which there are no known effective treatments, and in these cases it will be hard, if not impossible, to establish that medical or correctional personnel should have taken any particular course of action. For example, in an 8th Circuit case, a prisoner who had sought sex offender treatment had his claim fail because there was no known "cure." *Bailey v. Gardebring,* 940 F.2d 1150 (8th Cir. 1991). (For other cases regarding failure to provide medical treatment for sexual offenders, in which courts found no deliberate indifference, see *Riddle v. Mondragon,* 83 F.3d 1197 (10th Cir. 1996); *Richmond v. Cagle,* 920 F.Supp. 955 (E.D. Wis. 1996)). Medical dietary requirements can be serious, in, for example, the case of diabetes. *Taylor v. Anderson,* 868 F.Supp. 1024 (N.D. Ill. 1994).

"Serious medical need" is probably easier to understand through examples than definitions. The cases below, categorized by type, should give you some sense of how the courts have interpreted the concept.

1. Harm created by conditions: asbestos, smoking, etc.
* Exposure to environmental tobacco smoke was a matter both of present and possible future harm, stating an Eighth Amendment claim. *Helling,* above.

* Prison officials' deliberate indifference to inmate's exposure to environmental tobacco smoke can violate Eighth Amendment. *Warren v. Keane,* 196 F.3d 330 (2d Cir. 1999).

* Though officials didn't provide treatment until 3 days after inmate's asbestos exposure, cold-like symptoms he presented were not serious enough to invoke Eighth Amendment. *Smith v. Montefiore Med. Center Health Services,* 22 F.Supp.2d 275 (S.D.N.Y. 1998).

2. TB & AIDS
* *Taylor v. Barnett,* 105 F.Supp.2d 483 (E.D. Va. 2000). Good source for opinions related to HIV/AIDS in prison.

* Prisoner's having contracted tuberculosis not result of deliberate indifference, since prison had implemented standards approved by the Center for Disease Control and American Thoracic Society. (This is an example of the importance of knowing what the standard of care is

Case 2:15-cv-14465-MFL-RSW ECF No. 1 PageID.25 Filed 12/24/15 Page 25 of 50
Search Result - § 63 Liability for Negligence or Malpractice of Others
Page 50 of 4

Case 2:15-cv-14465-MFL-RSW ECF No. 1 PageID.25 Filed 12/24/15 Page 25 of 4


*24 M.L.P. 2d PHYSICIANS & HEALTH CARE PROFESSIONALS § 63*

Michigan Law & Practice

Copyright 2015, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

PHYSICIANS & HEALTH CARE PROFESSIONALS
Chapter 5 NEGLIGENCE AND MALPRACTICE

24 M.L.P. 2d PHYSICIANS & HEALTH CARE PROFESSIONALS § 63

## § 63. Liability for Negligence or Malpractice of Others

**A physician is responsible for an injury done to a patient by the malpractice of an assistant, apprentice, agent, or employee.**

A physician is responsible for an injury done to a patient through a want of proper care and skill by an assistant, apprentice, agent, or employee. The fact that a physician's assistant is a member of the same or a similar profession does not make the rule of respondeat superior inapplicable, and a physician is liable not only for the negligence of lay employees, but also for the negligence of employees who are nurses or physicians. [821]

A physician is not liable for the negligence of hospital or other nurses, attendants, or interns, who are not his or her employees, where the physician has no actual or constructive knowledge of their negligence. [822]

One who causes injury to plaintiff and a physician who is negligent in diagnosing and treating plaintiff's injuries each owe plaintiff a different duty, and they are not joint tortfeasors. [823]

*Physician employed with another on same case.* Physicians employed together by the patient, and diagnosing or treating the case together, without withdrawal by, or discharge of, either, owe the same duty and are jointly liable for any negligence. Each of the physicians so employed is answerable both for his or her own conduct, and for the negligent acts or omissions of the other which he or she permits without objection, or which, by the exercise of reasonable diligence, should have observed, but a physician is not liable for negligent acts committed independently by another physician in his or her absence. [824] Where two physicians are independently employed on the same case, and there is no joint undertaking by them, a want of care by one is not imputable to the other. [825]

Physicians who are shareholders of a medical clinic are not vicariously liable for each other's acts where no principal-agent or master-servant relationship exists between them. [826]

A doctor who is contacted by a patient's treating physician to discuss treatment alternatives does not owe a duty of care to the patient whose case is discussed such as would support a medical malpractice claim. [827]

*Other physician recommended.* A physician who, because of an intended absence, recommends, in case of need, some other physician, is not liable for injuries resulting from the latter's want of skill or care unless the recommended physician is the referring physician's employee, agent,

or partner. [828]

*Emergency medical service personnel.* An authorizing physician and various administrative medical professionals of the pertinent medical facility are immune by statute from liability for the acts or omissions not the result of gross negligence or willful misconduct of a medical first responder, emergency medical technician, emergency medical technician specialist, paramedic, medical director of a medical control authority or his or her designee, and various employees of certain medical educational programs. [829] This provision does not limit immunity from liability granted under other law, [830] such as governmental immunity. [831]


Return to Text


**FOOTNOTES:**

Footnote 821. Winchester v. Meads, 372 Mich. 593, 127 N.W.2d 337 (1964) (unidentified nurse).

Penner v. Seaway Hosp., 102 Mich. App. 697, 302 N.W.2d 285 (1981) (claims that defendant doctor and defendant hospital failed to properly supervise care and treatment given to patient by others under their control and supervision alleged medical malpractice, rather than general negligence).

Lamb v. Oakwood Hosp. Corp., 41 Mich. App. 287, 200 N.W.2d 88 (1972) (where nurse was not negligent in giving intramuscular injection to patient who developed paralysis of left leg shortly after his release from hospital, physician who had ordered injection was not liable).

### Another doctor

If first doctor is assisted in operation by second doctor, and second doctor does his job in negligent manner, first doctor is responsible because he had right to control actions of second doctor.-- Frazier v. Hurd, 6 Mich. App. 317, 149 N.W.2d 226 (1967) , aff'd, 380 Mich. 291, 157 N.W.2d 249 (1968) .

### Chiropractor's employee

Where chiropractor's employee used chiropractor's clinic and X-ray machine to give treatment to his patient and employee thought she was furthering employer's interest in so doing, even if employee was exceeding her authority in using X-ray machine, that would not excuse chiropractor from negligence and relieve him from liability for burns sustained by patient as result of X-ray treatment.-- Barnes v. Mitchell, 341 Mich. 7, 67 N.W.2d 208 (1954) .

### Specialist supervising resident physician liable

McCullough v. Hutzel Hosp., 88 Mich. App. 235, 276 N.W.2d 569 (1979) .

### Surgeon's assistant

Agreement with patient by surgeon's assistant, as to anesthetic to be used, was binding on surgeon.-- Bishop v. Shurly, 237 Mich. 76, 211 N.W. 75 (1926) .

### Surgeon in charge

Surgeon in charge of operation had nondelegable duty to see that operation was performed with due care, and thus surgeon in charge was not relieved of responsibility for any liability established by evidence that one of doctors performing operation caught himself cutting in wrong place.-- Orozco v. Henry Ford Hosp., 408 Mich. 248, 290 N.W.2d 363 (1980) .

## Vicarious liability of hospital

*See, supra*, § 53; *see, also*, M.L.P.2d Public Health and Welfare, §§ 21 et seq. (Hospitals).

☥Footnote 822. Estate of Burks v. Ross, 438 F.2d 230 (6th Cir. Mich. 1971) .

Abbe v. Woman's Hosp. Ass'n, 35 Mich. App. 429, 192 N.W.2d 691 (1971) .

## Maternity home

A physician delivering baby at maternity home of woman employed by baby's father is not liable for injuries to baby because of such woman's unauthorized negligent acts in absence of physician, who did not observe them and was not bound to do so in exercise of reasonable vigilance.-- Wabeke v. Bull, 289 Mich. 551, 286 N.W. 825 (1939) .

☥Footnote 823. Sobotta v. Vogel, 37 Mich. App. 59, 194 N.W.2d 564 (1971) .

☥Footnote 824. Naccarato v. Grob, 384 Mich. 248, 180 N.W.2d 788 (1970) (where two pediatricians independently treated plaintiff and negligently failed to administer tests for phenylketonuria, a progressive disease, first of treating doctors was liable for all of plaintiff's injuries; second treating doctor was liable only for that portion occurring after his treatment had begun).

Rodgers v. Canfield, 272 Mich. 562, 262 N.W. 409 (1935) .

McClaine v. Alger, 150 Mich. App. 306, 388 N.W.2d 349 (1986) .

Howard v. Park, 37 Mich. App. 496, 195 N.W.2d 39 (1972) .

☥Footnote 825. Brown v. Bennett, 157 Mich. 654, 122 N.W. 305 (1909) (surgical sponge left in wound).

☥Footnote 826. McClaine v. Alger, 150 Mich. App. 306, 388 N.W.2d 349 (1986) .

☥Footnote 827. Hill v. Kokosky, 186 Mich. App. 300, 463 N.W.2d 265 (1990) .

☥Footnote 828. Hitchcock v. Burgett, 38 Mich. 501 (1878) .

☥Footnote 829. MCLS § 333.20965(1).

☥Footnote 830. MCLS § 333.20965(4).

☥Footnote 831. *See* M.L.P.2d Counties § 80; M.L.P.2d Municipal Corporations § 261 et seq.; M.L.P.2d State § 46.

Michigan Digest, Medicine and Surgery §§ 60, 78.50.

## Immunity granted

City's fire department was discharging its governmental functions, when it tried to resuscitate the decedent and because MCLS § 691.1407(1). provided that a governmental entity was immune from tort liability if the governmental agency was engaged in the exercise or discharge of a governmental function, MCLS § 333.20965(4), meant that a city was immune from suit in the discharge of a governmental function.-- Omelenchuk v. City of Warren, 466 Mich. 524, 647 N.W.2d 493 (2002) .



**LexisNexis**  About LexisNexis  | Privacy Policy  | Terms & Conditions  | Contact Us  **RELX** Group™
Copyright ©  2015 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

---

Carl Bennett                          )
                                      )
         Plaintiff,                   )
                                      )          Case No.
    -V-                               )          _____
                                      )
Michigan Dept. of Corrections         )
Jackson Allegiance Hospital           )
                                      )
         Defendant,                   )
_____/            )

Carl Bennett No.298713
Pugsley Corr. Facility
7401 East Walton Road
Kingsley, MI 49649

Michigan Dept. Of Corrections
Office of Legal Affairs
Grandview Plaza
P.O. Box 30003
Lansing, MI 48909

Jackson Allegiance Hospital
Jackson, Michigan
_____/


+    **NOTICE OF INTENT**    +


**PROOF OF SERVCE**

**MOTION**

+    +    **STATEMENT OF FACTS**    +    +

```
_____         )
Carl Bennett                        )
                                    )
        Plaintiff,                  )
                                    )         Case No.
    -V-                             )
                                    )         _____
Michigan Dept. of Corrections       )
Jackson Allegiance Hospital         )
                                    )
        Defendant,                  )
_____/        )
                                    )
```

Carl Bennett No.298713
Pugsley Corr. Facility
7401 East Walton Road
Kingsley, MI 49649

Michigan Dept. Of Corrections
Office of Legal Affairs
Grandview Plaza
P.O. Box 30003
Lansing, MI 48909

Jackson Allegiance Hospital
Jackson, Michigan
_____/

## ✦   <u>NOTICE OF INTENT</u>   ✦

NOW COMES THE Plaintiff, Carl Bennett, under MCR 2.002 intends to seek damages from the defendants in this matter for the negligent care provided to plaintiff during his incarceration and medical care when he suffered a heart attack and was in the care of said medical provider.

WHEREAS, this Plaintiff intends to file this complaint in state court for damages he suffered as a result of there "Negligent Action" in this matter and prays that said court will grant relief in this matter.

Respectfully,

Date: 12/21/65

*Carl Bennett* 298713

Carl Bennett No.298713

*IN PRO-PER*

_____      )
Carl Bennett                   )
                               )
         Plaintiff,            )
                               )
-v-                            )          Case No.
                               )          _____
Michigan Dept. Of Corrections  )
Jackson Allegiance Hospital    )
                               )
         Defendant,            )
_____/     )


###   +   <u>PROOF OF SERVICE</u>   +

I, Carl Bennett No. 298713, being first duly sworn, state that on the

_21_ days of _DEC._ , 2015, served unto:

    Michigan Dept. Of Corrections        Jackson Allegiance Hospital
    Office of Legal Affairs              Jackson Michigan
    Grandview Plaza
    P.O. Box 30003
    Lansing, Michigan 48909

A copy of this "Notice of Intent", by mailing the same to them in a

sealed envelope, address with postage fully prepaid theron, and by depositing

the same in the United States Mail in Pugsley, Michigan 49649.


                                Respectfully,


Date:_12/21/15_                 _Carl Bennett_ 298713
                                In - PRO - PER
                                Carl Bennett No.298713
                                Pugsley Corr. Facility
                                7401 E. Walton Road
                                Kingsley, MI 49649

## +    NOTICE OF INTENT    +

## +   +    CARL BENNETT ID. NO.298713    +    +

This "Notice of Intent" by Mr. Carl Bennett, is to be consider predatory action to this plaintiff intent of filing a "Formal Complaint" and to seek an unspecified amount in damages do to the negligent action on the part of the Michigan Department of Corrections and the Jackson Alegency Hospital. Plaintiff now states;

## +   STATEMENT OF FACTS   +

When the plaintiff, Mr. Carl Bennett (inmate No.298713), enter into the department RG & C quarantine and guidance center on December 11,2013, he had a medical condition, known to the medical staff. About twelve (12) days into this quarantine process, he suffered a "heart attack" and was consider legally dead. In the process of this heart attack, he fell and suffered an injury to his crania (head). Plaintiff condition, prior to entering the prison system was told to medical staff through reports by "Otsego County Sheriff Dept. and with this knowledge, the medical staff at the guidance center still allowed prison staff to place plaintiff on a third floor tier, cell number 3-N-50.

Plaintiff was taken to the Jackson Alegency Hospital. The RN nurse administered medication (through a shot) and plaintiff expired again and plaintiff was revised again. Plaintiff was sedated and unable to comprehend his condition or surroundings.

Plaintiff was taken to a room and shackle to a bed (by his legs and wrist), and left unattended for a long period of time. After one week the shackles were taken off, but two correction office stayed with plaintiff every hour of the day. Plaintiff was retained in the hospital for a period of one

1.

(1) month. During that time he had surgery on his heart, but before this could be done hospital staff discover that plaintiff had contracted pneumonia and had fluid on his lungs. At surgery staff repaired and did a signal bia-pass. Due to plaintiff condition, "No" other work could be perform on his heart.

A couple of weeks after plaintiff by-pass surgery, the Department of Correction (M.D.O.C) sent plaintiff to the departments institutional hospital Dawayne Waters. After a couple of weeks there, Plaintiff was returned to Jackson prison (R.G.C), at that time he was placed on 1N-1st floor. A Doctor Mocha stated no stairs, but the MDOC did it anyways. Plaintiff stayed there for two weeks and then was sent to Jackson Cooper St. Facility (JCS), at no time did the MDOC provide plaintiff with proscribed medication issued from and because of the initial surgery. Plaintiff complain for over a month and was only given three (3) out of fourteen pills proscribed.

After complaining continually J.C.S. finally gave plaintiff all medication. After a few months of still having heart attack problems (plaintiff feel that Jackson Alegency Hospital performed negligent surgery), plaintiff was returned to Allegancy Hospital, plaintiff received news that his by-pass had collapsed his arteries, the hospital did s video probe from his groan to his heart and saw that the arteries had collapsed. J.C.S. informed plaintiff he had around 30 days expected life if he did not receive another open heard surgery and also stated that Jackson Allegiance Hospital would not repair the collapse by-pass surgery. After multiple video probes, plaintiff found (when they open him up) that the wires from his sternum had fell out. Lansing Hospital finish with a triple by-pass surgery, by taking arteries out of his wrist and two stents because of the shape of his heart, or should say half of a heart.

I am in need of a heart transplant, I have been open up three times. Plaintiff feels that Doctor Mocha from the Jackson Allegiance Hospital and staff, failed to repair plaintiff heart when they open him up the first time

2.

and through there negligent surgery, cause plaintiff undue suffering. Dr. Gandye from Lansing and the other doctors who did plaintiff triple by-pass, repaired the damage that Jackson Allegiance should have done and refused to do when they found that had screwed up. Dr. Gandye from Lansing McClearn Hospital stated how long there surgery will last, Plaintiff hope is, it will last till he gets release or someone takes responsibility for there negligence.

<div align="center">+   <u>**CONCLUSION AND RELIEF**</u>   +</div>

Plaintiff feels that the Department of Correction was totally negligent in placing plaintiff on the Third (3) floor tier, when they were fully aware of his medical condition. If it would not have been for inmate Bails (cell 51), the officers would never have know that plaintiff had expired and hit his head, till they performed their next regular count. Inmate Bails kept yelling till the officer came to see what the problem was. I feel that there was a complete lack of professionalism by D.O.C. staff and the Medical department of the Michigan Department of Correction. Plaintiff also feel that Jackson allegiance Hospital was also negligent in there workmanship and failure to repair the damage that there single by-passed caused. The department could have sent plaintiff to his hospital (the University of Michigan) and the doctors there knew of plaintiff condition and were familiar with his condition. Plaintiff also received two separate diseases, Raymond disease (Blood Flow), and Angina Diease (loss of oxygen, blood), both of these condition are on going.

THEREFORE, plaintiff ask that the defendants listed in this matter take Notice by and through this Notice of Intent that plaintiff will be filing a "Formal Complaint" within 60 days of this action.

Respectfully,

Carl Bennett No.298713

IN-PRO-PER

3.

BENNETT, CARL S

FROM ICTVS 517-483-4892                    (THU) JUL 24 2014  7:55/ST. 7:54/No. 7526930853 P  2



## CARDIOTHORACIC & VASCULAR SURGEONS

*Karl M. Carter, MD*
*Joseph V. Canzano, MD, FACS*
*Andrew M. Dudz, MD, FACS*
*Divyakant, R. Gandhi, MD, FACS*
*Gary L. Roth, DO, FACOS, FCCM*
*James G. Zitz, MD*
*Mohammed Hassan, MD*

Ingham Professional Building
405 W. Greenlawn
Suite 305
Lansing, MI 48910
(517) 483-4780
(877) 296-0111
Fax (517) 483-4961

**Bennett, Carl**

**Date of visit:** 06/27/2014
**DOB:** 12/21/1963   **Age:** 50 yrs.
**Medical record number:** 521307
**Account number:** 521307



Date: _____  Time: 0 825
The above-named patient's condition has not
changed since dictation of their History & Physical
report
Physician Signature: _____

**CURRENT DIAGNOSES**
1. Hyperlipidemia, 272.4
2. Hypertension-Essential (Benign), 401.1
3. Angina unstable, 411.1
4. MI-S/P Unspecified, 412
5. Asthma, 493.90
6. CAD, 414.00
7. Cardiomyopathy Ischemic, 414.8

**ALLERGIES**
NKDA

**MEDICATIONS**
1. aspirin 325 mg tablet, 1 by mouth daily
2. atorvastatin 20 mg tablet, 1 by mouth daily
3. Plavix 75 mg tablet, 1 by mouth daily
4. Coreg 3.125 mg tablet, 1 by mouth twice daily
5. lisinopril 2.5 mg tablet, 1 by mouth daily
6. nitroglycerin 0.4 mg tablet, subtingual, as needed
7. spironolactone 25 mg tablet, 1/2 tab daily
8. albuterol sulfate 90 mcg/actuation HFA Aerosol inhaler, as needed

*BENNETT, CARL S
1057684   1008623605
M   12/21/1963      SOS
07/24/2014  50Y
GANDHI, DIVYAKANT

**CHIEF COMPLAINTS**
Followup of Recurrent CAD

**HISTORY OF PRESENT ILLNESS**
The patient is a 50-year-old gentleman who underwent coronary artery bypass graft x 1 at Allegiance hospital with LIMA to LAD this was done about six month ago.  He has been having recurrent episodes of chest pain had a repeat cardiac catheterization which showed that the LIMA had a stenosis of about 90% just at the anastomotic site and an angioplasty was done however a stent could not be placed because of the tortuosity of the artery.  He underwent a repeat catheterization and it clearly shows that the stenosis has recurred.  He has also got occluded right coronary artery and an 80-90% stenosis of the circumflex.  The patient continues to get recurrent episodes of chest pain.

**REVIEW OF SYSTEMS**
*General/Constitutional:* 30 lb weight loss in last 6 months
*Integumentary:* hair loss, bottom of fingers turn white when outside
*Eyes:* wears eye glasses/contact lenses, decreased visual acuity
*Ears, Nose, Mouth, Throat:* denies hearing loss, denies epistaxis, denies hoarseness, denies difficulty speaking
*Respiratory:* dyspnea with exertion
*Cardiovascular:* chest pain, syncopal episodes related to postural changes
*Gastrointestinal:* denies ulcer disease, denies hematochezia and denies melena
*Musculoskeletal:* back pain
*Neurological:* stroke, approx. 2006 , 2010
*Psychiatric:* alcohol abuse
*Endocrine:* denies heat/cold intolerance, denies polydipsia, denies polyuria
*Hematological/Immunologic:* seasonal allergies

**PAST HISTORY**
*Past Medical Illnesses:* asthma; *Cardiovascular Illnesses:* angina, CAD, cardiomyopathy(Ischemic), hyperlipidemia, hypertension, S/P MI, Coronary vascular spasms; *Infectious Diseases:* mumps, measles and chickenpox during childhood; *Surgical Procedures:* CABG January 2014; *Trauma History:* steel rod in rt leg due to being hit by a car 1993; *Cardiology*

BENNETT, CARL S

FROM ICTVS 517-483-4982                    (THU) JUL 24 2014  7:55/ST. 7:54/No. 7528930853 P  3

 

*Patient:* BENNETT, CARL   MRNO: 521307   *DOB:* 12/21/1963  - *Continued*
*Procedures-Invasive:* PTCA with stent placement April 2014;

## CARDIAC RISK FACTOR SCREENING
*Tobacco Abuse:* Yes; *Family History of Heart Disease:* Yes; *Hyperlipidemia:* Yes; *Hypertension:* Yes; *Diabetes Mellitus:* No;
*Prior History of Heart Disease:* Yes; *Obesity:* No; *Sedentary Life Style:* No; *Age:* Yes; *Postmenopausal Female:* No;

## SOCIAL HISTORY
*Alcohol Use:* currently not drinking and history of alcohol abuse; *Smoking/Tobacco Use:*  used to smoke but quit. 35 pack year
history 1-2 ppd;
*Diet:* regular diet without modifications; *Caffeine Use:* 2 cups of coffee per day; *Exercise:* walking; *Occupation:* incarcerated;
*Illicit Drug Use:* cocaine abuse, marijuana abuse and in the 1990's;

## FAMILY HISTORY
*Father* - age 75, COPD; *Mother* - age 71, pacemaker; *Aunt(M)* - age 73, triple by-pass;

## PHYSICAL EXAMINATION

*Vital Signs*

Blood Pressure:
94/58 Sitting, Left arm, regular cuff
92/60 Sitting, Right arm, regular cuff

| | |
|---|---|
| Pulse: | 57/min. |
| Weight: | 142.00 lbs. |
| Height: | 68" |
| O2Sat: | 98% |
| BMI: | 21 |

```
BENNETT, CARL S
1057684  1000523805
M  12/21/1963    SDS
07/24/2014  50Y
GANDHI,DIVYAKANT
```

*Constitutional:* cooperative, alert and oriented, well developed, well nourished, in no acute distress

*Skin:* warm and dry to touch, no apparent skin lesions, no apparent masses noted

*Head:* normocephalic, non tender, no palpable masses

*Eyes:* EOMS intact, PERRL, conjunctivae and lids unremarkable

*ENT:* ears unremarkable, throat clear, without erythema, good dentition

*Neck:* no palpable masses or adenopathy, no thyromegaly, JVP normal, carotid pulses are full and equal bilaterally without
bruits

*Chest:* healed scar of median sternotomy without infection or instability, no tenderness to palpation, normal respiratory
excursion, normal diaphragmatic excursion, clear to auscultation

*Cardiac:* regular rhythm, S1 normal, S2 normal, no S3 or S4, apical impulse not displaced, no murmurs, no gallops, no rubs
detected

*Abdomen:* abdomen soft, bowel sounds normoactive, no masses, non-tender, no bruits

*Peripheral Pulses:* femoral pulses are full and equal bilaterally with no bruits auscultated, popliteal pulses are full and equal
bilaterally with no bruits auscultated, dorsalis pedis pulses are full and equal bilaterally with no bruits auscultated, posterior tibial
pulses are full and equal bilaterally with no bruits auscultated

*Lymphatic:* no lymphadenopathy

*Extremities & Back:* no deformities, no erythema, no edema, there are no spinal abnormalities noted, normal muscle strength
and tone, healed scar of attempted endoscopic left GSV harvest

*Psychiatric:* appropriate mood, memory and judgment

*Neurological:* no gross motor or sensory deficits noted

## MEDICATION BEFORE VISIT
1. albuterol sulfate 90 mcg/actuation HFA Aerosol Inhaler as needed
2. aspirin 325 mg tablet 1 by mouth daily
3. atorvastatin 20 mg tablet 1 by mouth daily
4. Coreg 3.125 mg tablet 1 by mouth twice daily

BENNETT, CARL S

FROM ICTVS 517-483-4882                    (THU)JUL 24 2014  7:56/ST. 7:54/No. 7526830853 P  4

 

Patient: BENNETT, CARL   MRNO: 521307   DOB: 12/21/1963 – Continued
5. lisinopril 2.5 mg tablet 1 by mouth daily
6. nitroglycerin 0.4 mg tablet, sublingual as needed
7. Plavix 75 mg tablet 1 by mouth daily
8. spironolactone 25 mg tablet 1/2 tab daily

**MEDICATION TODAY**
1. albuterol sulfate 90 mcg/actuation HFA Aerosol inhaler as needed
2. aspirin 325 mg tablet 1 by mouth daily
3. atorvastatin 20 mg tablet 1 by mouth daily
4. Coreg 3.125 mg tablet 1 by mouth twice daily
5. lisinopril 2.5 mg tablet 1 by mouth daily
6. nitroglycerin 0.4 mg tablet, sublingual as needed
7. Plavix 75 mg tablet 1 by mouth daily
8. spironolactone 25 mg tablet 1/2 tab daily

**IMPRESSIONS/PLAN**
I have discussed with the patient the options of medical management versus redo surgery to include coronary artery bypass graft x 3.  I discussed with him the risk of surgery including risk of myocardial infraction, stroke, infection, bleeding, renal failure, and long term ventilation.  The patient is agreeable for surgery and we shall schedule for surgery in the near future.

**TODAYS ORDERS**
1. CT Chest w/o Contrast: 1 week to assess aortic calcification
2. Schedule for: Re-Do CABg X 3 with Possible Radial possible RIMA possible GSV
3. Schedule surgery: July 16, 7.45 AM
4. Stop Plavix 10 days preop
5. Stop Lisinopril: 3 days preop
6. Carotid Duplex: 1 week h/o CVA
7. Radial Artery Mapping: with Allen test to assess usability for CABG 1 week
8. Greater Saphenous Vein Mapping: 1 week for Re-Do CABG

Physician:  Divyakant B. Gandhi, MD, FACS

*Referring Physician: PATEL, JASHU R*

Other Health Care Providers:
  1. PATEL, JASHU R

Divyakant B. Gandhi, MD, FACS

 

BENNETT, CARL S
1057684   1006523605
M  12/21/1963      SDS
07/24/2014  50Y
GANDHI,DIVYAKANT

BENNETT, CARL S




**GREATER LANSING**
**CONSULTATION RECORD**

## I REQUEST A **CONSULTATION** WITH: ICU  Dr. Kowalczyk

**FOR**

- ☐ OPINION & ADVICE ONLY
- ☐ OPINION & ADVICE AND WRITE PERTINENT ORDERS
- ☐ CO-MANAGE ALL ASPECTS OF PATIENT CARE IN YOUR SPECIALTY
- ☐ TRANSFER PATIENT TO YOUR SERVICE AND ASSUME MANAGEMENT
- ☐ ASSUME POST-HOSPITAL MANAGEMENT WITHIN YOUR FIELD
- ☐ REFER PATIENT BACK TO ME WHEN PRESENT PROBLEM WITHIN YOUR FIELD IS RESOLVED

**REGARDING** Vent Management    Page 1/2

**RN IS TO CALL CONSULTANT:**

- ☐ STAT
- ☐ DUE TO URGENT SITUATION I WILL CALL CONSULTANT
- ☐ EARLY A.M. TOMORROW

/ /   NOTIFICATION · DATE & TIME   A.M. P.M.   X   _____ REFERRING PHYSICIAN SIGNATURE   A.M. P.M.

NOTIFIER'S INITIAL    DATE    TIME

---

### CONSULTANT REPLY

ICU 60'

**CC:** Recurrent CAD    Code Status: Full code

**HPT:** Pnt transferred from surgery s/p
redo of triple CABG c̄ ® IMA and
® radial artery graft. Pnt first
underwent CABG x 1 @ Allegiance hosp.
c̄ ① IMA to LAD ~6 mo. ago. Recurrent
eps of CP led to a repeat cardiac cath
that showed the ① IMA had a stenosis
of 90% at the anastomic site. Angio-
plasty was done but a stent could not
be placed d/t the tortuosity of the artery.
Repeat cath showed stenosis recurred.
® coronary artery also occluded and
circumflex had 80-90% stenosis. It was
documented in 6/27/14 note that then
after Girhardi
it was decided do redo sx c̄ CABG graft x3.

**Mhx/Sx:** Asthma, Angina, CAD, ischemic
cardiomyopathy, hlipid, HTN, s/p MI,
coronary vascular spasms, CABG Jan 2014,
steel rod in ® leg, PTCA c̄ stent placement
April 2014.

**Social Hx:** ⊕ used to smoke but quit
35 pack yr c̄ 1-2 ppd,
currently not drinking but
hx of alcohol abuse,
cocaine and marijuana
abuse in 1990's. Incarcerated

**FHx:** Father age 75 COPD
Mother " 71 pacemaker
Aunt - 73 triple bypass

**Meds:** See med rec
**ROS:** unobtainable @ this time
**Allergies/Rxn:** NKDA

**PE:** Vitals: 117/72  P51  R16  100%
on vent , Temp 97.4°
Vent 50% Ox and 5 of PEEP
**Gen:** intubated & sedated
RRR +S1 +S2
CTABL no w/r/r
Abd +BS  NTTP ⊖ mass
⊖ organomegaly
⊖ edema extremities
A5?  pulses full bl UE + LE
skin warm + dry
⊖ osteo, tissue texture abN


Amy Wu DO
SIGNATURE   7/24/14
A.M. P.M.
DATE   TIME

**CONSULTATION RECORD**

671-07 REV. (1/12)
White • Medical Records
Canary • Physician

160


BENNETT, CARL S
1057684  1000523606
M  12/21/1963   SDS
07/24/2014  50Y
GANDHI, DIVYAKANT

BENNETT,  CARL  S





**McLaren**

**GREATER LANSING**
**CONSULTATION RECORD**

## I REQUEST A **CONSULTATION** WITH: ICU   Dr. Kowalczyk

**FOR**

☐ OPINION & ADVICE ONLY

☐ OPINION & ADVICE AND WRITE PERTINENT ORDERS

☐ CO-MANAGE ALL ASPECTS OF PATIENT CARE IN YOUR SPECIALTY

☐ TRANSFER PATIENT TO YOUR SERVICE AND ASSUME MANAGEMENT

☐ ASSUME POST-HOSPITAL MANAGEMENT WITHIN YOUR FIELD

☐ REFER PATIENT BACK TO ME WHEN PRESENT PROBLEM WITHIN YOUR FIELD IS RESOLVED

REGARDING _____ *page 2/2* _____

**RN IS TO CALL CONSULTANT:**

☐ STAT

☐ DUE TO URGENT SITUATION I WILL CALL CONSULTANT

☐ EARLY A.M. TOMORROW

____/____/____  A.M. P.M.   X _____
NOTIFICATION - DATE & TIME          REFERRING PHYSICIAN SIGNATURE

_____   A.M. P.M.
NOTIFIER'S INITIAL      DATE      TIME

### CONSULTANT REPLY

MCV 88.6
(10.9)

Labs: 143 | 113 | 7 ⟨164⟩ 16.0 / 32.5 \ 109
       3.7 | 25 | 0.73

Phos 2.6

Mg 2.6

Ca+ 1.08

PT 13.8   Fibrinogen 139
INR 1.3
PTT 28.9

ABG: 7/24 15:10  7.34 3/ 41.4 / 278 3/21.9/2.0

Act clotting time 7/24 13:35  549

Radiology: Chest PA portable : minor ВІ L. streaky atelectasis Ø pneumothorax, tubes + caths in place

Cardiac cath angiography 6/5/14 : LAD totally occluded beyond origin, distal filling only seen thru Ⓡ IMA artery injection. First obtuse marginal br of Ⓛ circumflex artery >90% focal stenosis. Distal circumflex normal. Ⓡ coronary artery totally occluded. distal anast site of Ⓛ IMA to LAD 80-85% stenosis Ant lat wall of Ⓛ ventricle hypokinetic and LVEF 35%.

A/P: 1) Recurrent CAD s/p redo of triple CABG - currently hemodynamically stable on Levophed 0.05 and Epi 0.05. cont monitoring PA, CVP and CI along c̄ BP and labs.

2) Hyperglycemia - 164. No strict control @ this time. Target 140-180.

3) Anemia - normocytic. H & H 10.9 & 32.5. Transfuse as needed (H at 7), stable now

4) Mg 2.6 - electrolyte replacement Q 8°

5) prophylaxis Abx - Kefzol

6) ABG - pm Q 6° tomorrow

7) VDRF 2nd day to #1 - Wean as tolerated

~~Amy Uurso~~
7/24/14        Job# 581978

 467I   7/25/14  ___ A.M. P.M.
SIGNATURE          DATE      TIME




**CONSULTATION RECORD**

671-67 REV. (1/12)
White • Medical Records
Canary • Physician

160

*BENNETT, CARL S
1067684  100623605
M  12/21/1963  SDS
07/24/2014  50Y
GANDHI,DIVYAKANT

BENNETT, CARL S

 **McLaren**

GREATER LANSING
Radiology Department
401 W. Greenlawn Ave. Lansing, MI 48910

Patient Name: **BENNETT, CARL S**       Med Rec #: **1057684**       DOB: **12/21/1963**

Procedure: **CT Chest WO Contrast**       Order Date: **07/10/2014**

Pt. Location: **OPT IN BED Greenlawn**       Acct #: **1000531941**
Accession #: **264468**

Order Phys: **GANDHI MD, DIVYAKANT**       Read By: GARBER DO, PAUL A

**EXAM, DATE AND TIME:**
CT scan of the chest 07/10/2014 11:53

**CLINICAL HISTORY:**
Chest pain, coronary artery disease

**TECHNIQUE:**
Noncontrasted CT scan of the chest with axial, coronal and sagittal images

**COMPARISON:**
No previous CT

**FINDINGS:**
Sternal wires and post sternotomy changes are visualized. Coronary
calcifications are noted. Heart is not enlarged. There is no evidence of
thoracic aneurysm or dissection. The thoracic esophagus is normal. The
limited upper abdominal liver, spleen, adrenal glands kidneys and stomach are
normal the incompletely visualized gallbladder is normal.

No acute lung process is seen

**IMPRESSIONS:**

1. Status post open chest/heart surgery with sternal wires of sternotomy
changes
2. No acute cardiopulmonary process


        *** THIS IS AN ELECTRONICALLY VERIFIED REPORT ***
7/10/2014 12:21 PM: Paul Garber, D.O.


D 07/10/2014 12:18
T 07/10/2014 12:21
J 5865330 PG/pg

**Signed by: PAUL A. GARBER**
Date: 07/10/2014 12:24


Transcribed:07/10/2014 12:24 by: GARBER DO, PAUL A.                    Account #: 1000531941

Confidentiality Notice: The information contained in this facsimile may be privileged and confidential. It is intended only for the use of the individual or entity to whom it was sent. If the recipient
of this transmittal is not the intended recipient, employee, or agent responsible to deliver it to the intended recipient, any dissemination, distribution, or copying of the communication is strictly
prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via U.S. Postal Service.

BENNETT, CARL S

 **McLaren**

GREATER LANSING
Radiology Department
401 W. Greenlawn Ave. Lansing, MI 48910

Patient Name: **BENNETT, CARL S**      Med Rec #: **1057684**      DOB: 12/21/1963

Procedure: **Chest PA and Lateral**                 Order Date: 07/10/2014

Pt. Location: **OPT IN BED Greenlawn**               Acct #: 1000531941
                                                     Accession #: 264482

Order Phys: **GANDHI MD, DIVYAKANT**                 Read By: ARCHAMBEAU MD, THOMAS J

**EXAM:**
Two-view chest 07/10/2014 01:30 p.m.

**HISTORY:**
Dyspnea

**TECHNIQUE:**
PA and lateral views

Comparison: No prior chest x-ray with which to compare.

Findings:

Patient is postop sternotomy. The heart size is within normal limits. Lungs
appear expanded with no acute infiltrates seen. No pleural effusion or
pneumothorax evident. Minor spurring in the spine.

Impression:
1. Postop sternotomy.
2. Minor spurring in the spine.
3. No definite acute infiltrate identified.

      *** THIS IS AN ELECTRONICALLY VERIFIED REPORT ***
7/10/2014 2:00 PM: Thomas Archambeau, M.D.


D 07/10/2014 13:59
T 07/10/2014 14:00
J 5865799 TJA/tja

**Signed by: THOMAS J. ARCHAMBEAU**
Date: 07/10/2014 14:03

Confidentiality Notice: The information contained in this facsimile may be privileged and confidential. It is intended only for the use of the individual or entity to whom it was sent. If the recipient of this transmittal is not the intended recipient, employee, or agent responsible to deliver it to the intended recipient, any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via U.S. Postal Service.

Page 1 of 1

BENNETT, CARL S

## McLaren
### GREATER LANSING

Patient Name: **BENNETT, CARL S**       Med Rec #: **1057684**          DOB: **12/21/1963**

Procedure:  **Chest PA Portable**                    Order Date:  **07/24/2014 15:35**

Pt. Location: **0368-01**                             Acct #:  1000523605
                                                     Accession #: 269158

Order Phys: **GANDHI MD, DIVYAKANT**              Read By: ARCHAMBEAU MD, THOMAS J

EXAM:
Portable chest 07/24/2014 03:50 p.m.

HISTORY:
Post open heart surgery

TECHNIQUE:
AP semi upright portable chest

Comparison: Two-view chest dated 07/10/2014.

Findings:

A new sternotomy has been performed since the prior study.  An ETT is now in
place with tip located above the carina.  Esophagogastric tube passes into
the stomach.  Right IJ catheter extends into the region of the right main
pulmonary artery.  Mediastinal as well as bilateral chest tubes in place.
Minor discoid atelectasis in both lungs.  No definite pneumothorax is seen.

Impression:  New postop sternotomy since the prior study with various tubes
and catheters in place as described above.  Minor bilateral streaky
atelectasis.  No definite pneumothorax identified.

       *** THIS IS AN ELECTRONICALLY VERIFIED REPORT ***
7/24/2014 4:09 PM: Thomas Archambeau, M.D.


D 07/24/2014  16:06
T 07/24/2014  16:09
J 5902535  TJA/tja

**Signed by: THOMAS J. ARCHAMBEAU**
Date: 07/24/2014 16:14

Confidentiality Notice: The information contained in this facsimile may be privileged and confidential  It is intended only for the use of the individual or entity to whom it was sent  If the recipient of this transmittal  is not the intended recipient, employee, or agent responsible to deliver it to the intended recipient, any dissemination, distribution, or copying of this communication is strictly prohibited  If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via U.S. Postal Service

BENNETT, CARL S

**◤ McLaren**
GREATER LANSING

Patient Name: **BENNETT, CARL S**      Med Rec #: **1057684**      DOB: **12/21/1963**

Procedure: **Chest PA Portable**

Pt. Location: **0368-01**

Order Phys: **GANDHI MD, DIVYAKANT**

Order Date: **07/25/2014 05:00**

Acct #: **1000523605**
Accession #: **269234**

Read By: **MITCHINSON MD, GREGORY**

EXAM, DATE AND TIME:
Portable chest dated 07/25/2049 06:08.

CLINICAL HISTORY:
Post open heart surgery.

TECHNIQUE:
A single mobile semi-erect view of the chest is obtained.

COMPARISON:
Semi-erect portable chest dated 07/24/2014 at 15:50.

FINDINGS:
Post median sternotomy changes are redemonstrated. A right internal jugular Swan-Ganz catheter remains in place with its tip in the proximal right main pulmonary artery. Bilateral pleural drains and mediastinal drainage tube remain in place.

There has been interval removal of the endotracheal and esophagogastric tubes. The lung volumes are low and there are new patchy opacities in the lung bases consistent with atelectasis or less likely infiltrate. No gross costophrenic angle blunting or pneumothorax is seen. Heart projects mildly enlarged with borderline to mild pulmonary venous hypertension.

IMPRESSIONS:

1. Post median sternotomy changes. Interval removal of the endotracheal and esophagogastric tubes. Of the tubes and catheters remain in place unchanged.
2. The lung volumes are now low and there are patchy air-space opacities in the lung bases consistent with atelectasis or less likely infiltrate.
3. Mild cardiomegaly with borderline to mild pulmonary venous hypertension.
4. Not mentioned above is mild to moderate gaseous distension of the stomach.

*** THIS IS AN ELECTRONICALLY VERIFIED REPORT ***
7/25/2014 7:07 AM:  Gregory Mitchinson, M.D.

D  07/25/2014  07:05
T  07/25/2014  07:07
J  5903287  GM/gm

Transcribed:07/25/2014 07:09 by: MITCHINSON MD, GREGORY                    Account #:  1000523605

Confidentiality Notice: The information contained in this facsimile may be privileged and confidential. It is intended only for the use of the individual or entity to whom it was sent. If the recipient of this transmittal is not the intended recipient, employee, or agent responsible to deliver it to the intended recipient, any dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via U.S. Postal Service

BENNETT, CARL S

**MCLAREN – GREATER LANSING**
Lansing, Michigan

| | |
|---|---|
| ATTENDING: | NAME: BENNETT, CARL S |
| REFERRING: | ACC#:1000523605 |
| FAM. PHYS: | A#:1057684 DOB:12/21/1963 |
| CONSULTANT: | ADMIT DATE: 07/24/2014 |
| SURGEON: Divyakant B. Gandhi, M.D. | SURGERY DATE: |
| RESIDENT: | PATIENT TYPE:  SURG |

### OPERATIVE REPORT

**PREOPERATIVE DIAGNOSIS:**
Severe recurrent coronary artery disease.

**POSTOPERATIVE DIAGNOSIS:**
Severe recurrent coronary artery disease.

**PROCEDURES:**
Redo sternotomy plus coronary artery bypass graft x3, right radial artery from LAD to M1 to posterior ventricular branch in sequence, right internal mammary artery from aorta to right radial artery between the LAD and M1 anastomosis.

**SURGEON:**
Divyakant B. Gandhi, M.D.

**ASSISTANT:**
Kevin Jager, PA-C

**ANESTHESIOLOGIST:**
Robert E. Tubben, DO

**CLINICAL HISTORY AND FINDINGS:**
This 50-year-old gentleman had undergone coronary artery bypass graft surgery x1 at Allegiance Hospital in January 2014.  Subsequently, he was having recurrent episodes of chest pain and he had a repeat cardiac catheterization, which has shown that the right coronary artery was chronically occluded even before the 1st surgery and there were no bypass grafts, it collateralized from the left.  The LAD was occluded.  The circumflex marginal had about a 70% stenosis proximally and there was a ramus that was fairly wide open.  The left internal mammary artery graft to LAD was patent, however, there was about an 80%-90% stenosis at its takeoff at its anastomosis to LAD.  He underwent an angioplasty of this and subsequently he continued to have chest pain.  A repeat cardiac catheterization showed that the stenosis had recurred.  A stent could not be passed since the left internal mammary artery was very tortuous.  He was, therefore, offered repeat surgery.  At operation, there were severe intrapericardial adhesions.  The aorta was readily free of calcification.  The left anterior descending artery measured 2.5 mm in diameter.  The marginal measured 1.5 mm in diameter and posterior ventricular branch measured 2 mm in diameter.

**DESCRIPTION OF PROCEDURE:**
**PAGE 1        CONTINUED**

O R I G I N A L

BENNETT, CARL S

ATTENDING:
REFERRING:
FAM. PHYS:
CONSULTANT:
SURGEON: Divyakant B. Gandhi, M.D.
RESIDENT:

NAME: BENNETT, CARL S
ACC#:1000523605
A#:1057684 DOB:12/21/1963
ADMIT DATE: 07/24/2014
SURGERY DATE:
PATIENT TYPE:  SURG

The patient was identified and taken to the operating room.  General anesthesia was instituted.  The patient was placed supine on the operating table with the right arm extended.  Chest wall, inferior extremity, and right upper extremity were prepared and draped in the usual manner.  A simultaneous redo sternotomy along with endoscopic right radial artery harvest was carried out.  The right side of the chest was elevated on a Rultract retractor and right internal mammary artery was dissected from proximal to distal, dividing its branches between clips.  The patient was given 5000 units of heparin and right internal mammary artery was divided proximally after placement of 2 large clips and distally with medium clips.  The internal mammary artery graft was then wrapped in papaverine-soaked gauze.  Dissection was then carried out intraoperatively to expose the right atrium, inferior wall of the right ventricle, and aorta. The patient was then fully heparinized and then cardiopulmonary bypass was instituted via cannula in the aorta and a two-stage venous cannula from right atrium to the IVC.  A left ventricular vent was placed via right superior pulmonary vein and further dissection was carried out to expose the left ventricle and the left internal mammary artery.  The left internal mammary artery was divided proximally and sutured with 6-0 Prolene sutures proximally as well as distally.  The mode of myocardial protection was as follows.  After achieving full cardiopulmonary bypass and a core temperature of 30 degrees centigrade, the aorta was crossclamped.  After dissection, antegrade cold blood cardioplegia was given for a total of 800 mL; thereafter, a retrograde cold blood cardioplegia was given for further 500 mL and _____ a left ventricular vent had been placed.  Thereafter, every 10-15 minutes, cold blood cardioplegia injected in a retrograde fashion as well as antegrade fashion, 300 to 400 mL each time, in between this, cold blood was perfused the heart in a similar fashion.  The right internal mammary artery to left radial artery anastomosis was done after removal of cross-clamp.  After achieving electromechanical quiescence, the posterior ventricular branch was dissected. Longitudinal arteriotomy made over it for a distance of 3 mm to which the distal end of the right radial artery was anastomosed in an end-to-side fashion using 7-0 Prolene.  This graft was then brought towards the first marginal where a side-to-side anastomosis was created between the 2 and subsequently the proximal end of the right radial artery was anastomosed to the left anterior descending artery in an end-to-side fashion using 7-0 Prolene.  A 4.0 mm aortotomy was done using a punch, to which the proximal end of the right internal mammary artery was anastomosed in an end-to-side fashion using 6-0 Prolene.  Thorough de-airing maneuver was carried out.  The crossclamp was then removed.  Retrograde cardioplegia cannula was removed.  Bulldog clamps were applied to the radial artery and a longitudinal arteriotomy was done between the LAD and the marginal anastomosis, to which the distal end of the right internal mammary artery was anastomosed in an end-to-side fashion using 7-0 Prolene.  After confirmation of hemostasis and 1 defibrillator shock, atrial and ventricular pacing wires were placed and after full rewarming, the left ventricular vent was removed and the patient was weaned off cardiopulmonary bypass.  Venous decannulation was carried out.  Protamine was given to reverse the effect of heparin.  Aortic decannulation was carried out and the site was

PAGE 2          CONTINUED

O R I G I N A L

BENNETT, CARL S

| | |
|---|---|
| ATTENDING: | NAME: BENNETT, CARL S |
| REFERRING: | ACC#:1000523605 |
| FAM. PHYS: | A#:1057684 DOB:12/21/1963 |
| CONSULTANT: | ADMIT DATE: 07/24/2014 |
| SURGEON: Divyakant B. Gandhi, M.D. | SURGERY DATE: |
| RESIDENT: | PATIENT TYPE:  SURG |

buttressed using pericardial pledgeted 4-0 Prolene sutures.  After confirmation
of hemostasis, pericardium overlying the aorta was loosely approximated with
interrupted 4-0 Prolene sutures.  Three chest tubes were placed, 1 in the
mediastinum, 1 in each of the pleural cavities.  Sternum was approximated using
stainless steel wires, fascia using #0 Vicryl Tycron, subcutaneous tissue using
3-0 Vicryl, and skin using subcuticular 4-0 Vicryl.  The patient tolerated the
procedure well, was transferred to the intensive care unit in a stable, but
critical condition.

DICTATED BY:  Divyakant B. Gandhi, M.D.


_____
Divyakant B. Gandhi, M.D.

----------IF ELECTRONICALLY SIGNED, AUTHENTICATION WILL APPEAR BELOW----------
JOB#: 581308
D: 07/24/2014 14:44:59
T: 07/24/2014 20:39:55
MEDQ:12287990

CC:   Divyakant B. Gandhi, M.D.



OPERATIVE REPORT








PAGE 3          END OF REPORT

                    O R I G I N A L



Authenticated by Divyakant Gandhi,MD On 07/25/2014 09:05:23 AM

BENNETT,  CARL  S

 **McLaren**
GREATER LANSING

Patient Name: **BENNETT, CARL S**     Med Rec #: **1057684**     DOB: **12/21/1963**

| | |
|---|---|
| Procedure: **Chest PA Portable** | Order Date: **07/30/2014 10:40** |
| Pt. Location: **0335-01** | Acct #: 1000523605<br>Accession #: 270786 |
| Order Phys: **JAGER PA-C, KEVIN F** | Read By: GARBER DO, PAUL A |

**EXAM, DATE AND TIME:**
Chest x-ray 07/30/2049 10:46

**CLINICAL HISTORY:**
Pain

**TECHNIQUE:**
Upright portable single projection

**COMPARISON:**
07/20/2014 and CT scan of the chest from 07/10/2014

**FINDINGS:**
The Preece identified chest tubes have been removed.  Sternal wires are
redemonstrated.  The cardiac silhouette and mediastinum are normal.  There
are perihilar densities extending from the right hilum which could be due to
recent previous surgery and/or inflammatory changes.

Hemidiaphragms defined.  Remaining lung fields are clear.

**IMPRESSIONS:**

1. Sternal wires are redemonstrated.  The previous chest tubes have been
removed.
2. Perihilar densities primarily on the right lobe of the left are
redemonstrated and may be due to inflammatory and/or postsurgical change.
The findings are mild.

       *** THIS IS AN ELECTRONICALLY VERIFIED REPORT ***
7/30/2014 11:06 AM: Paul Garber, D.O.

D 07/30/2014 11:00
T 07/30/2014 11:06
J 5915691 PG/pg

**Signed by: PAUL A. GARBER**
Date: 07/30/2014 11:09

Transcribed:07/30/2014 11:09 by: GARBER DO, PAUL A.        Account #: 1000523605

Confidentiality Notice: The information contained in this facsimile may be privileged and confidential  It is intended only for the use of the individual or entity to whom it was sent  If the recipient of this transmittal is not the intended recipient, employee, or agent responsible to deliver it to the intended recipient, any dissemination, distribution, or copying of the communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via U.S. Postal Service.

BENNETT,  CARL  S

 **McLaren**
GREATER LANSING

Patient Name: **BENNETT, CARL S**          Med Rec #: **1057684**          DOB: **12/21/1963**

| | |
|---|---|
| Procedure: **Chest PA Portable** | Order Date: **07/28/2014 15:02** |
| Pt. Location: **0335-01** | Acct #: 1000523605<br>Accession #: 270198 |
| Order Phys: **JAGER PA-C, KEVIN F** | Read By: KUCEJ MD, BRETT D |

**EXAM, DATE AND TIME:**
AP chest 07/28/2014 16:38

**HISTORY:**
Coronary artery disease

**COMPARISON(S):**
Chest x-ray 07/25/2014.

**FINDINGS:**
Sternotomy wires are present.  Pulmonary artery catheter has been removed.
Small right apical pneumothorax with 6 mm of pleural separation.  Pulmonary
vascular markings are more distinct than prior study peri Minimal right
perihilar linear density likely atelectasis.  No pulmonary edema.
Cardiomediastinal silhouette is stable

**IMPRESSION(S):**

1.  Interval resolution of minimal pulmonary vascular congestion
2.  New small right apical pneumothorax
3.  Minimal right perihilar atelectasis

　　　*** THIS IS AN ELECTRONICALLY VERIFIED REPORT ***
7/28/2014 4:48 PM:  Brett Kucej, M.D.


D  07/28/2014  16:46
T  07/28/2014  16:48
J  5911193  BK/bk

**Signed by: BRETT D. KUCEJ**
Date:  07/28/2014 16:51

Transcribed:07/28/2014 16:51 by:  KUCEJ MD, BRETT D.                    Account #:  1000523605

Confidentiality Notice: The information contained in this facsimile may be privileged and confidential.  It is intended only for the use of the individual or entity to whom it was sent.  If the recipient of this transmittal is not the intended recipient, employee, or agent responsible to deliver it to the intended recipient, any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via U.S. Postal Service

**Page 1 of 1**

BENNETT, CARL S

**MCLAREN - GREATER LANSING**
Lansing, Michigan

ATTENDING: Divyakant B. Gandhi, M.D.        NAME: BENNETT, CARL S
REFERRING:                                  ACC#:1000523605
FAM. PHYS:                                   A#:1057684 DOB:12/21/1963
CONSULTANT:                                  ADMIT DATE: 07/24/2014
SURGEON:                                     DISCHARGE DATE: 07/30/2014
RESIDENT: Kevin Jager, P.A.                  PATIENT TYPE:  SURG

### DISCHARGE SUMMARY

**ADMISSION DIAGNOSES:**
1. Coronary artery disease.
2. History of hypertension.
3. History of hyperlipidemia.
4. History of ischemic cardiomyopathy.
5. History of myocardial infarction.

**DISCHARGE DIAGNOSES:**
1. Coronary artery disease.
2. History of hypertension.
3. History of hyperlipidemia.
4. History of ischemic cardiomyopathy.
5. History of myocardial infarction.

**PROCEDURES AND OPERATIONS PERFORMED:**
Redo sternotomy plus redo coronary artery bypass grafting with right radial
artery from left anterior descending to first obtuse marginal to posterior
ventricular branch in sequential fashion with right internal mammary artery
used as a free graft from aorta to the right radial artery anastomosed between
the LAD and first obtuse marginal and small cyst sites, performed by Dr. Gandhi
on 07/24/2014.

**CONSULTATIONS:**
Dr. Kowalczyk for ICU care.

**HISTORY OF PRESENT ILLNESS:**
Carl Bennett is a 50-year-old male who underwent coronary artery bypass
grafting x1 with a left internal mammary artery to left anterior descending in
January 2014 at Allegiance Hospital.  The patient started having recurrent
episodes of chest pressure and underwent cardiac catheterization again at
Allegiance Hospital, this showed the left internal mammary artery at the
anastomotic site with the left anterior descending artery had a stenosis for
about 95% and the LAD itself was completely occluded proximally from the
takeoff of the left main.  The circumflex artery had a small marginal of which
the 1st OM had a 70% stenosis.  The right was dominant and occluded with
collaterals coming from the left.  A percutaneous dilatation of the anastomotic
site from the LIMA to the LAD was performed with 40% residual stenosis.  At
that time, it was noted that the LIMA had gone into spasm and repeat cath done
the following day, showed that there was no evidence of persistent spasm.
Because of the anastomosis site concern, the patient was referred for redo
PAGE 1        CONTINUED

O R I G I N A L

BENNETT, CARL S

ATTENDING: Divyakant B. Gandhi, M.D.
REFERRING:
FAM. PHYS:
CONSULTANT:
SURGEON:
RESIDENT: Kevin Jager, P.A.

NAME: BENNETT, CARL S
ACC#:1000523605
A#:1057684 DOB:12/21/1963
ADMIT DATE: 07/24/2014
DISCHARGE DATE: 07/30/2014
PATIENT TYPE:  SURG

coronary artery bypass grafting.

PAST MEDICAL HISTORY:
As mentioned above.

PAST SURGICAL HISTORY:
CABG in January 2014, right lower extremity ORIF in 1993, and PTCA with stent
placement in April 2014.

SOCIAL HISTORY:
The patient currently is not drinking and has a history of alcohol abuse.  The
patient used to smoke, however, quit, smoked 35 pack years, smoking 1-2 packs
per day.  The patient is currently incarcerated.

COURSE OF HOSPITALIZATION:
The patient was admitted to McLaren Greater Lansing Hospital on July 24, 2014,
and underwent triple coronary artery bypass grafting.  Following surgery, the
patient was transferred to the surgical intensive care unit where he was
evaluated by the ICU intensivist staff.  By the first postoperative day, the
patient was extubated, sitting in a chair, and being weaned off a small amount
of vasopressor support.  By the second postoperative day, the patient was
transferred out of the intensive care unit, having a Swan-Ganz catheter and
arterial monitoring lines removed.  The patient's Foley catheter was also
removed by the second postoperative day.  He was transferred to the Secure Wing
where a physical therapy and occupational therapy was started.

The patient's diet and activity were progressed.  His pacing wires were removed
by the 4th postoperative day and his chest tubes were removed by the 6th
postoperative day without any complication.  Followup chest x-ray showed no
residual pneumothorax following chest tube removal.  The patient was placed on
beta-blockade statin therapy and aspirin therapy, and because of an EF of 35%,
was continued on an ACE inhibitor upon his discharge from the hospital.  The
patient had an uneventful postoperative course and is healing quite nicely.

During the operation, a Prevena wound VAC was placed to the sternal incision
with instructions to be removed on the 7th postoperative day, which is
07/31/2014.

DISCHARGE LABORATORY DATA:
Magnesium 2.2, sodium 141, potassium 4.0, chloride 105, CO2 31, BUN 8,
creatinine 0.79, AST 16, ALT 22, alkaline phosphatase 82, phosphorus 3.9, white
blood cell count 5.8, hemoglobin 8.3, hematocrit 25.8, platelet count 307,000.

DISCHARGE INSTRUCTIONS:
Upon his discharge from the hospital, the patient will follow up with
Cardiology Dr. Jashu Patel in Jackson in 1-2 weeks' time and a correctional
facility is to call to arrange this appointment.  The patient will also follow
PAGE 2          CONTINUED

O R I G I N A L