UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL BENNETT,

      Plaintiff,                               Case No. 15-cv-14465
                                             Hon. Matthew F. Leitman

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

      Defendants.

_____/

## ORDER DISMISSING PLAINTIFF'S CLAIMS FOR FAILURE TO EXHAUST AVAILABLE ADMINISTRATIVE REMEDIES

Plaintiff Carl Bennett was previously in the custody of the Michigan Department of Corrections (the "MDOC").  In this action, Bennett claims that while he was in MDOC custody, the MDOC, certain employees of the MDOC, and certain employees of Corizon Health, Inc. ("Corizon"), a healthcare contractor for the MDOC, violated his constitutional and statutory rights by, among other things, failing to provide him necessary medications. (*See* Fourth Am. Compl., ECF No. 121.)

Defendant MDOC employees Heidi Washington, Joe Barrett, Shirley Harry, Jeff Woods, Connie Horton, Christine Ausmus, LaToya Caulford, Judy Crisenberry, Alline Curtis, Marguerite Walker, Sherri Winter, Lisa Wurmlinger, and the MDOC (the "MDOC Defendants"), and Corizon employees David Wright and Quinn

LaFleur (the "Corizon Defendants," collectively with the MDOC Defendants, the "Defendants") have raised several affirmative defenses to Bennett's claims.  One such affirmative defense is that Bennett failed to exhaust his available administrative remedies prior to bringing suit.  The Court held a bench trial on that defense on November 18, 2021.  (*See* 11/18/2021 Trial Tr., ECF No. 196.)

For the reasons explained below, having heard and considered the testimony and other evidence presented at the bench trial, and having carefully reviewed the parties' post-trial briefs, the Court concludes that Bennett failed to exhaust his available administrative remedies with respect his remaining claims against all of the remaining Defendants in this action other than Kay Garland.[1]  The Court feels very badly for Bennett that he had to endure a number of difficult health circumstances during his period of incarceration, but his failure to exhaust administrative remedies bars him from pursuing his claims against the MDOC Defendants and Corizon Defendants in this action.  The Court will therefore dismiss

---

[1] Bennett has also filed a claim in this action against Defendant Kay Garland, a nurse whom Bennett says violated his rights. (*See* Fourth Am. Compl. at ¶ 28, ECF No. 121, PageID.1655.)  Garland did not timely appear in this action, and on October 9, 2020, the Clerk of the Court entered a default against her. (*See* Order, ECF No. 176; Default, ECF No. 177.)  Garland has now appeared and moved to set aside the default. (*See* Mot., ECF No. 206.)  That motion remains pending before the Court.  Nothing in this order applies to Bennett's claims against Garland or shall be read as preventing Garland from raising any defenses to Bennett's claims (including but not limited to a failure-to-exhaust defense) if the Court grants her motion to set aside the default.

those claims and grant judgment in favor of the MDOC Defendants and Corizon Defendants on those claims.

## I

The operative pleading in this action is Bennett's Fourth Amended Complaint. (*See* Fourth Am. Compl., ECF No. 121.)  In that Complaint, Bennett brought the following claims against the Defendants: violation of the Eighth and Fourteenth Amendments to the United States Constitution (Count I); violation of the federal Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 *et seq*. (Count II); violation of the federal Rehabilitation Act, 29 U.S.C. § 701 *et seq*. (Count III), violation of the Michigan Persons with Disabilities Civil Rights Act, Mich. Comp. Laws § 37.1101 *et seq*. (Count IV); and negligent infliction of emotional distress (Count V). (*See id.* at ¶¶ 106–144, PageID.1668–1676.)  Bennett also sought declaratory and injunctive relief. (*See id*., PageID.1677.)

On September 26, 2019, the MDOC Defendants and the Corizon Defendants filed separate motions for summary judgment on all of Bennett's claims. (*See* Mots., ECF Nos. 127, 129.)  The MDOC Defendants argued, among other things, that Bennett failed to exhaust his administrative remedies and that some of his claims failed on the merits. (*See* Mot., ECF No. 129.)  The Corizon Defendants argued that Bennett's claims against them were barred by the applicable statute of limitations. (*See* Mot., ECF No. 127.)

The Court granted both motions in part and denied them in part.[2] (*See* Orders, ECF Nos. 163, 173.)  Relevant here, the Court determined that it needed to hold a bench trial "with respect to whether Bennett exhausted his administrative remedies." (Order, ECF No. 163, PageID.2383. *See also* Order, ECF No. 191.)

The Court held the bench trial on November 18, 2021.[3] (*See* 11/18/2021 Trial Tr., ECF No. 196.)  At that trial, the Court heard testimony from Bennett, Bennett's mother, and Richard Russell, the grievance section manager and hearings administrator for the MDOC.  Following the bench trial, the parties submitted post-trial briefs. (*See* ECF Nos. 198, 199, 203.)

## II

## A

The Court begins with the legal background relevant to Defendants' failure-to-exhaust defense.  Under the Prison Litigation Reform Act (the "PLRA"), "[n]o

---

[2] The following claims against the MDOC Defendants and Corizon Defendants remain in this action: (1) Bennett's constitutional claims against the individual MDOC Defendants, (2) Bennett's ADA and Rehabilitation Act claims against the MDOC, and (3) Bennett's claims against the Corizon Defendants based on alleged acts and omissions in February-June 2016.

[3] The Corizon Defendants did not move for summary judgment on the basis that Bennett had failed to exhaust his administrative remedies.  However, the Corizon Defendants did raise Bennett's failure to exhaust as an affirmative defense. (*See* Corizon Defs.' Affirmative Defenses at ¶ 17, ECF No. 126, PageID.1716.)  The Court therefore allowed the Corizon Defendants to participate in the bench trial.  The Corizon Defendants did not present any testimony or exhibits at the trial.  Instead, they relied upon the testimony and evidence presented by the MDOC Defendants.

action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).  The PLRA requires exhaustion in order to "allow[ ] prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court [...] and to improve the quality of suits that are filed by producing a useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007).

"Failure to exhaust [under the PLRA] is an affirmative defense." *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019).  Thus, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216.  Instead, "defendants [bear] the burden of proof on exhaustion." *Sules v. Anderson*, 678 F.3d 452, 455 (6th Cir. 2012); *see also id.* at 456 ("A PLRA defendant bears the burden of proving that a PLRA plaintiff has not exhausted his administrative remedies").  Where, as here, there is a dispute of fact with respect to exhaustion, that dispute is properly resolved by way of a bench trial. *See Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015) (holding that "disputed issues of fact regarding exhaustion under the PLRA present[] a matter of judicial administration that could be decided in a bench trial").

**B**

In order for a prisoner to exhaust his administrative remedies, he must "us[e] all steps that the [prison] holds out" in its internal grievance procedure "and do[] so properly (so that the [prison] addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90, 93 (2006) (quotations omitted).  Thus, a prison's requirements, not the PLRA, "define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

MDOC Policy Directive 03.02.130 governs the MDOC's grievance process. (*See* Russell Trial Testimony, ECF No. 196, PageID.2838, in which Russell confirmed that "PD 03-02-130" "control[led] the prisoner[] grievance process" at issue.)  That directive provides that "[c]omplaints filed by prisoners regarding grievable issues as defined in this policy serve to exhaust a prisoner's administrative remedies only when filed as a grievance through all three steps of the grievance process in compliance with this policy." (MDOC Trial Ex. 1, MDOC Policy Directive 03.02.130(B), ECF No. 129-2, PageID.1979.)  Those "three steps" proceed as follows:

- First, "[p]rior to submitting a written grievance, [a] grievant shall attempt to resolve the issue with the staff member involved within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control." (*Id.* at ¶ P, PageID.1799.)  "If the issue is not resolved, the grievant may file a Step I grievance. The Step I grievance must be filed within five business days after the grievant attempted to resolve the issue with appropriate staff." (*Id.*)

- Second, "[a] grievant may file a Step II grievance if s/he is dissatisfied with the response received at Step I or if s/he did not receive a timely response. To

file a Step II grievance, the grievant must request a Prisoner/Parolee Grievance Appeal (CSJ-247B) from the Step I Grievance Coordinator and send the completed form to the Step II Grievance Coordinator designated for the facility, field office, or other office being grieved within ten business days after receiving the Step I response or, if no response was received, within ten business days after the date the response was due, including any extensions." (*Id.* at ¶ BB, PageID.1801.)

- Finally, "[a] grievant may file a Step III grievance if s/he is dissatisfied with the Step II response or does not receive a timely response. To file a Step III grievance, the grievant must send a completed Step III grievance, using the Prisoner/Parolee Grievance Appeal form (CSJ-247B), to the Grievance and Appeals Section within ten business days after receiving the Step II response or, if no response was received, within ten business days after the date the response was due, including any extensions." (*Id.* at ¶¶ FF, PageID.1802.)

If a prisoner proceeds "completely through Step III" and receives a decision on the merits of his grievance, the prisoner's "administrative remedies are [] exhausted." (Russell Trial Testimony, ECF No. 196, PageID.2854.)

## C

Finally, prisoners need only "exhaust available remedies," and they need "not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016). A prison's internal grievance procedure is "unavailable" where (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," (2) it is "so opaque that it becomes, practically speaking, incapable of use" and "no ordinary prisoner can discern or navigate it," or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation [....] such interference with an

inmate's pursuit of relief renders the administrative process unavailable." *Id.* at 643–44.

## III

### A

At the bench trial, the MDOC Defendants presented credible and persuasive evidence that the grievance process described above was available to Bennett and that Bennett failed to exhaust his available administrative remedies with respect to any of his remaining claims against the Defendants. That evidence primarily came from Russell. As relevant here, Russell testified that:

- "The way a prisoner would exhaust [his administrative remedies] would be [to go] through all three steps of the grievance process" described in MDOC Policy Directive 03.02.130. (Russell Trial Testimony, ECF No. 196, PageID.2847.);

- "If a prisoner is dissatisfied with [the response at] Step I, then the prisoner [] can go to Step II," and if a prisoner "does not receive a Step II response within the allotted period of time under the policy, then the prisoner can automatically appeal that grievance to Step III without having to go through any staff member." (*Id.*, PageID.2856–2857.);

- If a prisoner does not get a response to a grievance or feels that "somebody is blocking" his ability to complete any step of the process, the prisoner can "write a kite" or "they [could] put in another grievance that states the process isn't working and they can pursue it that way." (*Id.*, PageID.2858, 2860.);

- "If a prisoner [was] having difficulty with the grievance process [….] they [would] be given assistance" by MDOC staff members. (*Id.*, PageID.2856.);

- Prisoners could contact the "legislative ombudsmen" at any time if they were having problems with MDOC employees and/or felt they were not getting

proper relief through the grievance system.  And the MDOC is "responsible under law to respond to the ombudsmen's office." (*Id.*, PageID.2922.); and

- Bennett did not proceed through Step III of the MDOC's grievance procedure with respect to any grievance that he filed while he was incarcerated. (*See id.*, PageID.2861–2863; 2873–2879.)

The MDOC Defendants also introduced into evidence Bennett's "MDOC Prisoner Step III Grievance Report." (MDOC Trial Ex. 3.)  That report collects data from the MDOC's "prisoner grievance database" and lists all grievances that a prisoner has filed through Step III of the grievance process. (Russell Trial Testimony, ECF No. 196, PageID.2862.)  The report confirmed that the MDOC did not "receive[ any] Step III appeals [from Bennett] for the entire time that [he] was incarcerated." (*Id.*, PageID.2863.)

The Court found Russell's testimony and the documentary evidence presented by the MDOC Defendants to be credible and reliable.  Taken as a whole, that evidence is more than sufficient to support findings that the grievance process was available to Bennett and that Bennett did not exhaust his available administrative remedies with respect to any of his remaining claims against the Defendants.

**B**

Bennett countered with his own trial evidence that, he says, establishes that the MDOC's grievance process was not available to him.  For the reasons described below, the Court did not find Bennett's evidence to be persuasive.

**1**

**a**

Bennett first argues that the MDOC prevented him from being able to complete the grievance process by repeatedly transferring him between prisons in a manner that made it impossible for him to timely file Step I grievances and/or Step II and III appeals. (*See* Bennett Trial Br., ECF No. 203, PageID.3036.) In his post-trial brief, he insists that those "multiple transfers to different prison facilities" impeded his "ability to follow the grievance process" and file his grievances on time. (*Id*.)

But Bennett's trial testimony did not persuasively support this theory of unavailability. Bennett's testimony concerning how the transfers impeded his ability to complete the grievance process was not particularly clear. Moreover, Bennett appeared to suggest that it was his disapproval of an MDOC rule, rather than his transfers, that (at least in part) caused his failure to complete the grievance process. For instance, when Bennett's counsel directly asked him to explain how his transfers impacted his ability to utilize the grievance process, Bennett testified as follows:

> Q. Okay. I think you previously testified about being moved around. How did you think that affected the processing of your grievances?
>
> A. A lot. Because sometimes –
>
> Q. Can you explain?

A. – they would send me to places that didn't even have law books or nothing. They didn't have – I mean, they still had grievances in there but by the time I got there, it was already – it was already time-related because then by the time I would have to send it back to the other facility, *I said why should I have to do that? You're one – you're one – you're one MDOC. There shouldn't – I should not have to send it back to one facility and then to another. That doesn't even make sense. But that's – I don't know, I guess that's the way they do it. Like I said, I'm not very good at stuff like that.* I never did like getting into that kind of, grievances and all that crap.

(Bennett Trial Testimony, ECF No. 196, PageID.2946-2947; emphasis added.)

Later in his testimony, Bennett again noted that his disapproval of the grievance procedures and his own objections to that process, as opposed to his transfers, may have caused him to fail to complete the grievance process with respect to some of his grievances:

Q. Was it your understanding then that you had to restart the [grievance] process when you moved [between MDOC facilities]?

A. Yes. I didn't know that at first because they said you have to send it back to the facility. *I said why? It's like I'm at another facility, I'm still in Michigan. And they said I had to go back to the same facility or send them the letter or go through the prisoner mail and do it that way or go to a counselor and have him do it and I'm like, oh my God. That's pretty – I don't know. To me, that's just a little ignorance but it doesn't make sense to me.*

Q. There was testimony about the policy – or do you recall there being like books with the actual – or something, a pamphlet or something with all the policies listed?

11

> A. There is probably a – there is books in there that show all the policies, you know, and what they stand for and what you're filing against and stuff like that, *but like I said, I wasn't very good at doing that* so I had people helping me do that, too.

(*Id.*, PageID.2948-2949; emphases added.)

Simply put, Bennett did not offer convincing testimony that linked his transfers to his inability to timely comply with the deadlines in the grievance process. His testimony about the impact of his transfers was largely generalized; he did not persuasively connect the dots between any specific transfer and any specific failure to complete the grievance process on time.

Moreover, the Court is not persuaded by Bennett's contention that his transfers rendered the grievance process unavailable to him because he was moved to facilities that "didn't even have law books." (*Id.*, PageID.2946-2647.)  At other points in his testimony, he seemed to indicate that "books" *were* available to him that "show[ed] all the policies." (*Id.*, PageID.2949.) More importantly, Bennett's explanation as to why he needed access to the law books in order to file his grievances does not withstand scrutiny.  Bennett testified that he needed access those books because he was required to identify certain policy numbers in his grievances:

> Q. Mr. Bennett, why did you need books to file a grievance complaining about not getting your medications?
>
> A. Because a lot of that, you have to go through the law books to figure out what you're filing against the medications on it and you have to have policy numbers

and all that in it. Because I didn't know none of the policies or none of that stuff. Because when you file for medications against – a grievance against on getting medications, you still have to have the policy numbers. And sometimes they would give them to you but it wouldn't state all the – all the procedures in it.

(*Id.*, PageID.2948.)  However, Bennett has not cited any MDOC rule that required him to identify specific policy numbers in his grievances, and the governing Policy Directive in the record seems to suggest that Bennett did not need to do so.  MDOC Policy Directive 03.02.130, which governs the grievance process within the MDOC, requires only that inmates identify "the facts involving the issue being grieved." (MDOC Policy Directive 03.02.130(R), ECF No. 129-2, PageID.1800.)  Thus, it appears that Bennett could have filed a grievance complaining about his lack of medications even without access to legal books and authorities.  The Court does not find reliable Bennett's testimony to the contrary.

For all of the reasons explained above, Bennett's testimony did not convince the Court that his transfers prevented him from filing a grievance and/or meeting the time deadlines within the grievance process and thereby rendered the process unavailable to him.

Bennett's testimony was admittedly not the only evidence that he offered in support of his claim that his transfers rendered the grievance process unavailable to him.  He also introduced into evidence documents showing his transfer history and the dates that he filed certain grievances.  But his testimony was the linchpin of his

contention that the transfers rendered the process unavailable to him.  That testimony was necessary to link the transfers reflected on his documentary evidence to his claimed inability to pursue his grievances, but the testimony did not persuasively do so.  For all of these reasons, the Court concludes that Bennett's evidence fails to establish that the grievance process was unavailable to him because his transfer between prisons prevented him from complying with the time deadlines for filing grievances and appeals.

<strong>b</strong>

The MDOC Defendants add that even if Bennett had shown that his transfers caused him to miss certain deadlines in the grievance process, those transfers nonetheless would not have rendered the grievance process unavailable to him.  The MDOC Defendants have presented evidence that the grievance process, itself, (1) accounts for filing delays that an inmate may experience as a result of a transfer and (2) allows prisoners to seek review of a decision rejecting a grievance or step appeal on the basis of untimeliness.  The MDOC Defendants direct the Court to the provision of the grievance policy stating that "grievances shall not rejected if there is a valid reason for the delay; *e.g.*, transfer." (MDOC Policy Directive 03.02.130(G)(3), ECF No. 129-2, PageID.1798.)  Moreover, Russell explained during his testimony that if a grievance is rejected as untimely at Step I or Step II, a prisoner can appeal that determination at Step II or Step III on the basis that the

prisoner could not timely file his grievance due to a transfer. (*See* Russell Trial Testimony, ECF No. 196, PageID.2854.)  Russell added that if a prisoner did so, the initial untimeliness determination "could be reviewed and overturned at either Step II or Step III." (*Id.*)  In other words, if Bennett "was dissatisfied or felt [the] rejection [of his grievances as untimely] was incorrect" due to the time lost while being transferred between prisons, he had the ability to raise that argument in an appeal of the denial of any grievance. (*Id.*)  Bennett acknowledged as much. (*See* Bennett Trial Testimony, ECF No. 196, PageID.2951.)  And there is no evidence Bennett ever filed such an appeal.  Thus, the MDOC Defendants contend, even if one of Bennett's grievances or step appeals was rejected as untimely due to one of his transfers, the grievance process still would have been available to him because he could have sought further review of that denial and may have been entitled to relief upon a showing that the untimeliness was due to a transfer.

Bennett has not offered a persuasive response to this line of argument. Bennett says that he did not understand that he could have appealed the rejection of his grievances as untimely on the basis that a transfer made filing the grievance on time impossible. (*See*, *e.g.*, Bennett Trial Testimony, ECF No. 196, PageID.2951.) But Russell testified that when prisoners arrive in MDOC custody, they are provided a handbook that explains the MDOC's policies and procedures – including the grievance procedure – and he testified that if prisoners need assistance with the

grievance process, they can "request some help" from a "prison counselor" or MDOC staff member. (Russell Trial Testimony, ECF No. 196, PageID.2856, 2900.) And, as quoted above, Bennett testified that he had access to "books" that explained the grievance process and that he "had people helping [him]" when filing grievances. (Bennett Trial Testimony, ECF No. 196, PageID.2948–2949.) The Court therefore cannot conclude that the grievance process was unavailable to Bennett because he did not understand the process. On this record, and under these circumstances, the MDOC Defendants' argument further supports a finding that Bennett's transfers did not render the grievance process unavailable to him.

2

Bennett next argues that the MDOC rendered the grievance process unavailable to him by blocking his ability to send one Step III appeal form – for Grievance JCS 15-02-0090-12F – to the Step III reviewers in Lansing, Michigan. More specifically, Bennett testified that he twice placed his Step III appeal form for that grievance in an envelope and deposited the envelope in "a mailbox" that was located inside his housing unit. (*Id.*, PageID.2946.) Bennett said that on both occasions, the envelope containing his Step III appeal form was returned to him within "two or three days" and was not delivered to the Step III reviewers. (*Id.*, PageID.2941.) Bennett testified that when the envelopes were returned to him, they were "stamped" like they were supposed to be mailed, but they "w[eren't] going

16

out." (*Id.*, PageID.2946.)  Bennett said that after this happened a second time, he placed the Step III appeal form "in another envelope and sent it to [his] mom." (*Id.*) Bennett insists that because he attempted to mail the Step III appeal form twice and it was returned to him both times, the grievance process was unavailable to him with respect to Grievance JCS 15-02-0090-12F.

The Court does not find Bennett's testimony about the return of his Step III appeal form to be reliable.  The repeated return of the form so quickly and for no reason seems unusual.  Indeed, even Bennett acknowledged that receiving the stamped envelopes back in only two to three days seemed out of the ordinary because prison mail usually "[t]akes longer than that just to go out," much less be returned to a prisoner. (*Id.*, PageID.2941.)  Bennett has not offered persuasive evidence to substantiate his claim that this seemingly-unusual event occurred.  For instance, Bennett has not produced the "stamped" envelopes that were supposedly returned to him after he placed them in the mailbox.  Nor has he identified the MDOC employee(s) who returned the envelopes to him.  And he has not identified a single witness who saw the envelopes being returned to him or who saw him with the returned envelopes.  Finally, he has not provided the name of any person with whom he contemporaneously discussed the return of the envelopes, nor has he presented corroborating evidence from such a witness.  Given the absence of persuasive

17

corroborating evidence, the Court is not persuaded by Bennett's testimony that the MDOC blocked his ability to send his Step III appeal form to Lansing.

### 3

Next, Bennett argues that the MDOC rendered the grievance process unavailable to him because "his grievance letters were thrown in the trash by grievance counselors." (Bennett Trial Br., ECF No. 203, PageID.3036.)  But at the bench trial, Bennett testified only that on one occasion, he "gave" a grievance counselor a grievance, and the counselor "thr[ew] it in the garbage." (Bennett Trial Testimony, ECF No. 196, PageID.2945–2946.)  Bennett did not identify which grievance was thrown out, the subject of the grievance (*i.e.*, whether the grievance related to any claims raised in this case), the prison counselor who threw the grievance away, the date when the grievance was thrown away, or any other specific information about this incident.  Bennett's testimony about his isolated encounter with the counselor who allegedly threw away his grievance form does not persuade the Court that the grievance process was unavailable with respect to the claims he asserts in this action.

### 4

Finally, Bennett argues that the grievance process was unavailable to him because "his [grievance] paperwork would be taken from him during shake-downs, causing him to redo all of his paperwork regarding grievances." (Bennett Trial Br.,

ECF No. 3036, PageID.203.)  But, again, Bennett's trial testimony does not support this theory of unavailability.

Bennett testified that "four or five times" MDOC officials would search his cell and take "paperwork" from him:

> Q. Okay. And I think you stated – you had issues with your paperwork being taken from you?
>
> A. Yes. They would do shake-downs or – and take my paperwork and they would go through it and read it and they would make – they would make us all leave out of the cell anyway. And then they'd make us stand out in the day room or something like that and then they would shake everybody's – I'd come back and half my paperwork is gone and so I would have to start back over and try to find whatever I could salvage out of it. They did that about four or five times.
>
> Q. Where did that happen?
>
> A. JCS twice. Pugsley once or twice, too. And I think it happened 16 once up in – I don't know if it was Kinross or Chippewa. One of them.
>
> Q. Did you get the paperwork back or was it –
>
> A. No, no. No, you ain't getting nothing back. Believe that.

(Bennett Trial Testimony, ECF No. 196, PageID.2968.)

This testimony falls short of establishing unavailability for at least three reasons.  First, Bennett never specifically described the "paperwork" that was taken or even testified that that paperwork was relevant to any of his claims in this case.

Second, Bennett never connected any of these "shake-downs" to his inability to file any particular grievance on time.  Third, Bennett has not produced any evidence that he ever filed any grievances arising out of these "shake-downs" or ever raised the "shake-downs" in any of his step appeals as an explanation for why he was not able to file a grievance or step appeal on time.  Bennett's testimony about the "shake-downs" of his cell therefore failed to persuade the Court that the grievance process was unavailable to him.

**5**

For all of these reasons, the Court is not persuaded that the MDOC rendered the grievance process unavailable to Bennett with respect to any of his grievances.

**IV**

In the alternative, Bennett argues that even assuming, *arguendo*, the grievance process was available to him, the Court should deem him to have fully completed all three steps of the grievance process with respect to Grievance JCS 15-02-0090-12F (the grievance discussed above).  In support of this argument, Bennett says that after he was prevented from sending his Step III appeal form for this grievance through the prison mail system, he sent the form to his mother and asked her to mail it to the grievance coordinator in Lansing. (*See* Bennett Trial Testimony, ECF No. 196, PageID.2947.)  Bennett's mother, Elaine Canfield, also testified at the bench trial. She confirmed that she received a letter from Bennett asking her to send an enclosed

envelope to Lansing, and Canfield said that she took that envelope to the "post office" and mailed it as Bennett directed. (Canfield Trial Testimony, ECF No. 196, PageID.2971 2972.) Bennett insists that his mother's mailing of the Step III appeal form to Lansing fully exhausted his administrative remedies with respect to this grievance.

For several reasons, the Court is not persuaded that Bennett did complete Step III of the grievance process with respect to Grievance JCS 15-02-0090-12F in this manner. First, during Russell's testimony, he explained that as soon as a Step III appeal form is received by the MDOC's "central office" for processing, "it gets date-stamped […] saying it's been received," and it is then "entered" into the MDOC's computer database that tracks all inmate grievances. (Russell Trial Testimony, ECF No. 196, PageID.2919–2920.) Russell further testified that the MDOC did not have in its possession a date-stamped Step III appeal form with respect to Grievance JCS 15-02-0090-12F, and no record of such an appeal was ever entered into the MDOC's database. (*See id.*, PageID.2920.) According to Russell, this meant that the Step III appeal from was "never received" by the MDOC. (*Id.*) The Court found this testimony to be credible.

Second, Bennett has not presented any persuasive evidence that could corroborate his mother's testimony that she mailed his Step III appeal form to Lansing, such as a receipt from the Post Office or a return receipt (if one was

requested).   Moreover, Bennett's mother testified that she never looked at the document that she mailed to Lansing on her son's behalf. (*See id.*, PageID.2972.) Thus, she was unable to confirm that the document she sent was in fact the Step III appeal form.[4]

Finally, Bennett's claim that the MDOC blocked him and his mother from separately trying to send the Step III appeal form to Lansing does not seem plausible. For the Court to accept Bennett's version of events, it would have to conclude that (1) at least one MDOC employee at Bennett's prison facility blocked him from mailing his Step III appeal form to Lansing *and* (2) a separate MDOC employee in Lansing either (a) joined the first employee's effort to block Bennett from completing the grievance process by intentionally refusing to acknowledge receipt of the Step III appeal form after his mother mailed it or (b) just happened to lose track of the form after Bennett's mother successfully mailed it to Lansing.   These scenarios strike the Court as improbable.

---

[4] Bennett's mother also could not remember key facts about the document she mailed.   She could not remember if she mailed it via registered mail or return receipt requested, who in Lansing she mailed it to, or the address where it was mailed. (*See* Canfield Trial Testimony, ECF No. 196, PageID.2972.)  And while this lack of recall is certainly understandable given Bennett's mother's age and the passage of time, it nonetheless leaves several unanswered questions about the mailing of Bennett's Step III appeal form.

For all of these reasons, the Court is not persuaded that Bennett completed his Step III appeal with respect to Grievance JCS 15-02-0090-12F by having his mother mail the Step III form to Lansing.

## V

Finally, in his trial brief, Bennett argues that he was not required to exhaust his administrative remedies against the Corizon Defendants because they are employees of Corizon and not the MDOC. (*See* Bennett Trial Br., ECF No. 203, PageID.3041–3042.)   According to Bennett, "[w]hile MDOC Policy # 03.02.130 provides the administrative remedies and exhaustion requirements for prisoners, it is clearly only applicable to [the] MDOC. [...] Thus, [Bennett] could not have failed to exhaust his administrative remedies as to [the Corizon Defendants]." (*Id.*)

The Sixth Circuit recently rejected a nearly identical argument.  In *Kitchen v. Snyder*, 2021 WL 4470032 (6th Cir. June 23, 2021), a Michigan prisoner argued that he was not required to exhaust his administrative remedies against Corizon.  In support of that argument, the prisoner – like Bennett here – cited only generally to the MDOC's grievance policy and did not identify any particular provision of the policy that indicated that it did not apply to Corizon.  The Sixth Circuit found the inmate's argument insufficient because "he [did] not identify any section of the grievance policy that specifically forbids him from filing a grievance against Corizon or its representatives." *Id.* at *4.  The Sixth Circuit added that "[c]ourts in

this circuit have recognized that a prisoner must file a grievance against service providers like Corizon to exhaust administrative remedies," *id*. (citing *Vandiver v. Corr. Med. Servs., Inc.*, 326 F. App'x 885, 889-90 (6th Cir. 2009); and *Washington v. Hutchinson*, 2009 WL 2923162, at *4 (E.D. Mich. Sept. 10, 2009))[5], and the court affirmed a district court's dismissal of claims against Corizon based on a failure to exhaust. *See id.  Kitchen* illustrates that Bennett has not offered sufficient support for his contention that he had no obligation to exhaust his administrative remedies against the Corizon Defendants.

## VI

As explained above, the Court finds credible the MDOC Defendants' evidence and testimony supporting their contention that the grievance process was available to Bennett and that he failed to complete that process with respect to any of the claims he brings in this action against the MDOC Defendants or the Corizon Defendants.  As further explained above, while the Court does not believe that Bennett was deliberately trying to mislead the Court, the Court does not find Bennett's countervailing testimony and evidence to be reliable or to meaningfully

---

[5] *See also Taylor v. Corizon Medical Corp.*, 2018 WL 4292398, at *2 (E.D. Mich., Sept. 10, 2018) (dismissing claims against Corizon due to plaintiff's "failure to exhaust administrative remedies"); *Ragland v. Corizon Health, Inc.*, 2020 WL 5200884, at *4 (W.D. Mich. Sept. 1, 2020) (dismissing claim against Corizon based on a plaintiff's failure to exhaust); *Doss v. Corizon Medical Corp.*, 2020 WL 6286269, at *1 (E.D. Mich. Oct. 27, 2020) (granting Corizon's motion for summary judgment on the basis that plaintiff failed to exhaust his administrative remedies).

connect of any of the conduct by the MDOC that he identified to his inability to file any particular grievance or step appeal at issue. Accordingly, the Court finds as a matter of fact that (1) the grievance process described in MDOC Policy Directive 03.02.130 was available to Bennett and (2) Bennett did not complete all three steps of that procedure with respect to any of his remaining claims in this action against the MDOC Defendants or the Corizon Defendants. The MDOC Defendants and the Corizon Defendants carried their burden of proof on those two points. Based upon these factual findings, the Court concludes, as a matter of law, that Bennett failed to exhaust his administrative remedies with respect to his remaining claims against the MDOC Defendants and the Corizon Defendants.

Because Bennett failed to exhaust his available administrative remedies, the MDOC Defendants and the Corizon Defendants are entitled to judgment on those claims.

## VII

For all of the reasons explained above, the Court **GRANTS** judgment in favor of Defendants (other than Defendant Garland) on their failure-to-exhaust defense. Bennett's claims against those Defendants are **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: March 29, 2022

25

    I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 29, 2022, by electronic means and/or ordinary mail.

                                    s/Holly A. Ryan
                                    Case Manager
                                    (313) 234-5126